Dana W. BURNS, Plaintiff–Appellant,

v.

CITY OF COLUMBUS, DEPARTMENT OF PUBLIC SAFETY, DIVISION OF POLICE, Defendant–Appellee.

No. 95–3227.

United States Court of Appeals, Sixth Circuit.

Argued March 21, 1996.

Decided Aug. 7, 1996.

Mark S. Coco (argued and briefed), Harris, McClellan, Bianau & Cox, Columbus, OH, for Dana W. Burns.

Stephanie Mitchell Hughes (argued and briefed), Columbus City Attorney's Office, Civil Div., Columbus, OH, for City of Columbus, Dept. of Public Safety, Div. of Police.

Before: MARTIN and MOORE, Circuit Judges, and JOINER, District Judge.*

* The Honorable Charles W. Joiner, United States District Judge for the Eastern District of Michigan, sitting by designation.

BOYCE F. MARTIN, Jr., Circuit Judge.

Under Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 and Ohio Rev. Code § 4112.02, Dana Burns alleges that he was unlawfully terminated from the Columbus, Ohio, police force solely because he was handicapped with a condition known as "reflex sympathetic dystrophy"[1] in his right arm incurred due to a neck injury he received at the Police Training Academy. We conclude that Burns has failed to establish an element of his prima facie case and also has not carried his burden of proof to show that the City's nondiscriminatory reasons for terminating him were pretextual. Accordingly, we affirm the district court's decision granting the City's motion for summary judgment.

Dana Burns was selected for the Columbus police department's 80th recruit class on September 16, 1991. As part of his Police Training Academy activities in November of 1991, Burns was engaged in a wrestling match during which he was thrown on a mat and lost consciousness. He regained consciousness and finished, but was soon taken to a hospital where he was diagnosed with a concussion and neck injury. Burns missed one day of training because of the injury, but later completed this training as required. He graduated from the Academy in February of 1992.

In mid-February, Burns began his "field training" which consists of working "on the street" with a training officer. Although field training usually includes one five-week session and a second four-week session, trainees who perform unsatisfactorily may be required to complete a third session. Burns was required to participate in three field training sessions with a different supervising officer each session. His final field training supervisor, David Ralls, recommended that, despite Burns's inconsistent performance, he should be retained by the department. In Ralls's deposition, however, he indicated that Burns's performance was unsatisfactory, that he displayed poor judgment, and that he threatened Ralls's safety on two occasions.

For example, in response to a report about a man with a gun on a playground, Burns drove past a man perfectly fitting the report's description. When Ralls asked if Burns saw the man, Burns said that he intended to approach the man from the front, an unsafe approach in Ralls's eyes. Moreover, when Ralls and Burns were stopping a car full of passengers in a neighborhood notorious for drug dealing, Burns allowed a passenger to leave the scene without following police procedure. Ralls claimed that Burns's lack of control over the situation threatened Ralls's safety. Thus, even during his third field training session, Burns's performance was problematic.

In addition, during Burns's period of field training, two citizens complained about Burns's off-duty conduct. The first complaint came from a woman who alleged that Burns cut her off while driving. After she angrily gestured at Burns, Burns allegedly held up his police hat. In response to the woman's complaint, a police sergeant warned Burns that his behavior was unacceptable. A second incident involved a dispute between Burns and a car salesman. The salesman complained that after he told Burns that the car he had ordered would arrive later than expected, Burns angrily told the salesman that "if I weren't a police officer I would kick [your] ass." Burns received a minor reprimand for this incident.

In May of 1992, after Burns completed his field training, the seven-member Field Training Officers Board reviewed Burns's performance and decided to recommend termination of his employment. In its recommendation to the Chief of Police, the Board cited Burns's weaknesses during all three field training periods, indicating an "inability to perform the basic duties of a police officer," as well as the two off-duty incidents which the Board interpreted as a "tendency to abuse police power." The Board's recommendation was unanimous. Included in the record are the affidavits of three Board members who state that they were unaware

---

1. Generally speaking, reflex sympathetic dystrophy is a deep pain and loss of mobility in an extremity caused by extreme contraction or dilation of blood vessels, which in turn alters the nutritional supply to nerves within the body. It is often the result of a localized injury to the body.

of Burns's neck injury when they voted to terminate his employment. None of the Board members was aware of Burns's reflex sympathetic dystrophy because he had not yet been diagnosed with the condition. After being informed of the Board's recommendation and after being temporarily assigned to a civilian position pending review of that decision, Burns left his new post within a couple of hours and never returned to work. On July 1, 1992, the Safety Director of the City, Ronald Poole, terminated Burns for unsatisfactory performance during his probationary period based on the Board's recommendation.

Burns stated in his deposition that when he returned to Academy training after his injury he never told his training officers that his doctor had instructed him to stay at home. He stated that he could function as an officer through the end of his training program. Although he claims to have complained about pain in his arm, and missed a day of boxing while in the hospital, he admits disregarding his doctor's advice not to box in order to avoid repeating the class. Burns also acknowledged that his condition had not been diagnosed at the time the Board recommended termination. Burns's reflex sympathetic dystrophy was diagnosed after June 30, 1992, when he came under the care of Albert L. Beraducci, Jr., M.D.[2]

■ On May 25, 1993, Burns filed suit in federal district court seeking redress under the federal Rehabilitation Act and Section 4112.02 of the Ohio Revised Code, alleging

that the City terminated him because he was handicapped with a neck injury that developed into reflex sympathetic dystrophy. The City moved for summary judgment and the district court granted the motion on January 31, 1995. The district court reasoned that the record contained not a scintilla of evidence that Burns was handicapped[3] as defined by the Act at the time of his termination because his neck injury did not limit one or more of Burns's major life activities.[4] The court further found that Burns had not presented evidence to create a factual dispute as to whether he was otherwise qualified for the job or that the City's reasons for terminating him were a pretext. We review a district court's decision to grant summary judgment *de novo*. *Rowley v. United States*, 76 F.3d 796, 799 (6th Cir.1996).

■ The federal statute at issue here, the Rehabilitation Act of 1973, provides in pertinent part that

[n]o otherwise qualified individual with a disability in the United States, as defined in section 706(8) of this title, shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance....

29 U.S.C. § 794 (1988 & Supp. IV 1992). In *Doherty v. Southern College of Optometry*, this Court outlined the elements of a cause of action under the Rehabilitation Act. 862 F.2d 570 (6th Cir.1988), *cert. denied*, 493 U.S. 810,

2. Dr. Beraducci's medical notes from June 30, 1992, show that, although he believed it was a "possibility" that Burns suffered from a reflex sympathetic dystrophy, he did not make such a diagnosis that day. On August 24, 1992, Dr. Beraducci continued to believe that it was "possible" that Burns had a mild reflex sympathetic dystrophy, but referred Burns to Dr. Lingam at the chronic pain control center at Ohio State University for further evaluation. In his medical notes dated October 1, 1992, Dr. Beraducci states that a doctor at Ohio State University diagnosed Burns with reflex sympathetic dystrophy. Thus, the earliest date on which Burns was diagnosed with the condition was sometime after August 24, 1992, almost two months after the City's Safety Director terminated Burns.

3. Congress amended the Rehabilitation Act in 1992, substituting the word "disability" for the

word "handicap," and adding subsections (b), (c) and (d). Rehabilitation Acts Amendments of 1992, Pub.L. 102–569, § 102(p)(32)(A), (B) and § 506. We will, at times, use the word handicap for the sake of continuity with language in the district court's opinion.

4. The current definition of an "individual with a disability" (a "handicapped person" in the original text of the Rehabilitation Act) is found at 29 U.S.C. § 706(8)(B) (1988 & Supp. IV 1992). Subsection 706(8)(B) provides that:

[T]he term "individual with a disability" means ... any person who (i) has a physical or mental impairment which substantially limits one or more of such person's major life activities, (ii) has a record of such an impairment, or (iii) is regarded as having such an impairment.

110 S.Ct. 53, 107 L.Ed.2d 22 (1989). To prevail in a Rehabilitation Act case, the plaintiff ultimately must prove (1) that he or she is a "handicapped person" under the Act; (2) that he or she is "otherwise qualified";[5] (3) that he or she is being excluded from participation in, being denied the benefits of, or being subjected to discrimination under the program solely because of his or her handicap; and (4) that the program or activity receives federal funds. *Id.* at 573.

Although these are the elements of a Rehabilitation Act "claim," the particular and characteristic factual disputes plaintiffs have raised in Rehabilitation Act cases have led courts to categorize these claims into several types. *Smith v. Barton,* 914 F.2d 1330, 1339 (9th Cir.1990) (observing that commentators have identified four types of handicap discrimination claims), *cert. denied,* 501 U.S. 1217, 111 S.Ct. 2825, 115 L.Ed.2d 995 (1991); *Prewitt v. United States Postal Serv.,* 662 F.2d 292, 305 n. 19 (5th Cir.1981) (same) (citing Note, *Accommodating the Handicapped: The Meaning of Discrimination Under Section 504 of the Rehabilitation Act,* 55 N.Y.U. L.Rev. 881, 883–84 (1980)); *Barth v. Gelb,* 2 F.3d 1180, 1186 (D.C.Cir.1993) (identifying three types of handicap discrimination cases), *cert. denied,* —— U.S. ——, 114 S.Ct. 1538, 128 L.Ed.2d 190 (1994); *Doe v. New York Univ.,* 666 F.2d 761, 776 (2d Cir. 1981) (identifying two types of claims); *Norcross v. Sneed,* 755 F.2d 113, 116 (8th Cir. 1985) (accepting *Doe*'s description of handicap discrimination claims). As identified by the Second Circuit in *Doe,* the most fundamental distinction between types of handicap discrimination claims turns on whether the grantee of federal funds *acknowledges or*

*relies on* the handicap in making a decision adverse to the plaintiff. *Doe,* 666 F.2d at 776. Where a grantee claims that the handicap was not a consideration in its decision, courts have identified this type of claim as a "straightforward handicap discrimination claim," or an "intentional discrimination for reasons of social bias" claim. *Smith,* 914 F.2d at 1339; *Prewitt,* 662 F.2d at 305 n. 19. In Title VII[6] parlance, this type of claim is sometimes called a "pretextual disparate treatment" claim. *Healey v. Southwood Psychiatric Hosp.,* 78 F.3d 128 (3d Cir.1996); *Reidt v. County of Trempealeau,* 975 F.2d 1336, 1341 (7th Cir.1992); *In re Pan American World Airways, Inc.,* 905 F.2d 1457, 1460 (11th Cir.1990). These labels refer to a case, such as this one, where the grantee or employer disclaims any reliance on the impermissible attribute (race, gender, disability, etc.), in making its decision and no other direct evidence of discriminatory intent exists. Here, the City states that it discharged Burns for valid, non-discriminatory reasons *unrelated* to his handicap. Burns claims that the City's reasons are not true. The City did not argue, in contrast, that it recognizes that Burns is a disabled person, but that his disability disqualified him for the position of police officer.

Whether a grantee of federal funds may permissibly acknowledge or rely on a person's disability in its decisionmaking illustrates a fundamental distinction between most Rehabilitation Act cases and Title VII cases. Unlike Title VII cases, where race or sex will almost never be an acceptable reason for an employment decision adverse to a qualified employee,[7] the Rehabilitation Act permits an employer to make a decision *be-*

---

5. The "otherwise qualified" element, has been interpreted to mean that a disabled individual must be otherwise qualified for the job or program with or without the grantee making a reasonable accommodation of the plaintiff's disability. *Sandison v. Michigan High Sch. Athletic Ass'n,* 64 F.3d 1026, 1034 (6th Cir.1995) (citation omitted); *Jasany v. United States Postal Serv.,* 755 F.2d 1244, 1250 (6th Cir.1985) (citing 29 C.F.R. § 1613.702(f)); *see also Smith & Lee Assocs. v. City of Taylor,* 13 F.3d 920, 930 (6th Cir.1993) (discussing the definition of "reasonable accommodation").

6. Title VII makes it an unlawful employment practice to discriminate against an individual on the basis of race, color, religion, sex, or national origin. 42 U.S.C. § 2000e–2(a); *Daniels v. Board of Educ. of Ravenna City Sch. Dist.,* 805 F.2d 203, 206 (6th Cir.1986).

7. In some cases, Title VII permits an employer to make an employment decision based on what ordinarily would be an impermissible basis—such a race, sex or religion—if the employer's race, sex or religion qualification is a "bona fide occupational qualification reasonably necessary to the normal operation of [a] particular business or enterprise[.]" 42 U.S.C. § 2000e–2(e).

*cause of* a handicap if the handicap is not the *sole* reason for the decision. "The Rehabilitation Act forbids discrimination based on stereotypes about a handicap, but it does not forbid decisions based on the actual attributes of the handicap." *Pesterfield v. Tennessee Valley Auth.*, 941 F.2d 437, 443 (6th Cir.1991). A federal grantee may make an employment decision adverse to a handicapped person if, for example, the person's handicap causes him or her to be unable to perform an essential function of the job. *School Bd. of Nassau County v. Arline*, 480 U.S. 273, 288 n. 17, 107 S.Ct. 1123, 1131 n. 17, 94 L.Ed.2d 307 (1987) (citations omitted); *Jasany*, 755 F.2d at 1250. Thus, in some Rehabilitation Act cases, the grantee acknowledges or relies on the plaintiff's handicap in making its decision, but argues that the handicap is not the sole reason for its decision. The defendant will argue that the disability causes the plaintiff to be unqualified for the position or program, whether with or without reasonable accommodation of the disability. We pause to make two comments about the distinction between cases where there is no direct evidence of the grantee's intent and cases where the grantee provides direct evidence of its intent by claiming that it relied on the handicap in its decisionmaking. First, whether a Rehabilitation Act claim falls into one category or the other often depends upon the *defendant/grantee's response* to the plaintiff's claim. This is because the plaintiff often will have no other direct evidence of the grantee's discriminatory intent. Thus, the defendant/grantee will respond to a plaintiff's Rehabilitation Act claim by saying either that it relied on or considered the plaintiff's handicap in its decisionmaking, or that it did not. It is the grantee's response that will often determine the type of case before the court and therefore, as discussed below, whether the subjective intent of the grantee will be subject to proof by the nontraditional evidentiary method set forth in *McDonnell Doug-*

*las/Burdine*. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–03, 93 S.Ct. 1817, 1824–25, 36 L.Ed.2d 668 (1973), *as refined by, Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 252–56, 101 S.Ct. 1089, 1093–95, 67 L.Ed.2d 207 (1981).[8]

Second, in cases in which the grantee states that it made the decision *because of* the handicap, the central factual dispute becomes whether the decision was made *solely because of* the handicap. Assuming that the plaintiff can prove the other elements of her prima facie case, the sole factual issue left for resolution is an objective one—whether the plaintiff is qualified for the position or program despite the handicap, with or without reasonable accommodation. In theory, this objective factual issue can be resolved by the traditional evidentiary method whereby the plaintiff establishes his or her prima facie case and then the defendant puts forth sufficient evidence to withstand a motion for summary judgment or to show that the plaintiff cannot prove his or her case by a preponderance of the evidence. Because the City has not provided direct evidence of its true intent by responding that it did indeed terminate Burns due to his alleged disability, we need not discuss the respective burdens each party may bear regarding whether the plaintiff is otherwise qualified with or without reasonable accommodation in a Rehabilitation Act case. We have discussed the relative burdens of proof or production the parties bear in a direct evidence case as they are set forth under the Americans with Disabilities Act in *Monette v. Electronic Data Sys. Corp.*, 90 F.3d 1173, 1182–87 (6th Cir.1996). By statute, the Americans with Disabilities Act standards apply in Rehabilitation Act cases alleging employment discrimination. 29 U.S.C. § 794(d).

In *McDonnell Douglas*, the Supreme Court set forth a method for shifting the evidentiary burden regarding proof of an

---

8. Appellate courts have "routinely employ[ed] the Title VII burden-shifting rules in pretext cases brought under the Rehabilitation Act." *Newman v. GHS Osteopathic, Inc.*, 60 F.3d 153, 157–58 (3d Cir.1995); *see also Tyler v. Runyon*, 70 F.3d 458, 466 (7th Cir.1995) (stating that "[b]ecause the 'remedies, procedures and rights available under the Rehabilitation Act are the same that are afforded under Title VII,' a plaintiff suing under the Rehabilitation Act may 'rely on ... the burden-shifting method borrowed from Title VII cases and originally established in *McDonnell Douglas Corp. v. Green...'*") (citations omitted).

employer's discriminatory intent in Title VII cases where plaintiff could not set forth direct evidence of discriminatory intent. 411 U.S. at 802–03, 93 S.Ct. at 1824–25. In Title VII cases where no direct evidence of discriminatory intent exists, the plaintiff must first establish a prima facie case of discrimination.[9] Once the plaintiff establishes the prima facie case, the employer must meet its burden of production to establish legitimate, non-discriminatory reasons for the discharge. *Burdine,* 450 U.S. at 253, 101 S.Ct. at 1093–94. The production burden then shifts back to the plaintiff to show by a preponderance that the employer's legitimate reasons are untrue. *Id.*; *see also, Daniels,* 805 F.2d at 206–10 (explaining the *McDonnell Douglas/Burdine* analysis).

■ As discussed by the Third Circuit in *Healey,* courts have not consistently understood when the *McDonnell Douglas/Burdine* burden-shifting analysis applies in Title VII cases. *Healey,* 78 F.3d at 131–32 (reviewing the district court's application of the *McDonnell Douglas/Burdine* analysis where an employer stated that it based its decision on the gender of the plaintiff). Not surprisingly, the same confusion has occurred in Rehabilitation Act cases. *See Monette,* 90 F.3d at 1177–78. What is perhaps most important to note is that the Supreme Court developed the *McDonnell Douglas/Burdine* burden-shifting analysis for Title VII cases as an available method of proof on the element of the grantee's subjective intent where no direct evidence of discriminatory intent exists. *Trans World Airlines, Inc. v. Thurston,* 469 U.S. 111, 122, 105 S.Ct. 613, 622, 83 L.Ed.2d 523 (1985) (stating that the *McDonnell Douglas/Burdine* analysis is "inapplicable where the plaintiff presents direct evidence of discrimination") (citation omitted); *Blalock v. Metals Trades, Inc.,* 775 F.2d 703, 706 (6th Cir.1985) (stating that "[d]irect evidence and the *McDonnell Douglas* formulation are simply different evidentiary paths by which to resolve the ultimate issue of defendant's discriminatory intent"), *cert. denied,* 490 U.S. 1064, 109 S.Ct. 2062, 104 L.Ed.2d 627 (1989). Thus, the *McDonnell Douglas/Burdine* burden-shifting approach is inapplicable where direct evidence of discrimination exists. Nonetheless, here, Burns does not have direct evidence that the City discriminated against him solely because of his handicap. Therefore, the *McDonnell Douglas/Burdine* analysis applies in the instant case.

■ To defeat a properly supported summary judgment motion under the *McDonnell Douglas/Burdine* framework, Burns must show that a genuine issue of material fact exists as to each element of his prime facie case. Burns has failed even this minimal evidentiary hurdle. Specifically, Burns has not established that the City *knew or believed* that he was handicapped. *Landefeld v. Marion General Hosp., Inc.,* 994 F.2d 1178, 1181 (6th Cir.1993) (reasoning, in a Rehabilitation Act case, that if the defendant did not know of plaintiff's handicap then the handicap could not have been a reason for plaintiff's dismissal; therefore, plaintiff had not established the element of his prima facie case that he was dismissed "solely because of" his handicap); *Hedberg v. Indiana Bell Telephone Co.,* 47 F.3d 928, 932 & n. 5 (7th Cir.1995) (holding that "an employer cannot be liable under the [Americans with Disabilities Act] for firing an employee when it indisputably had no knowledge of the disability;" declining to discuss whether defendant's knowledge ought to be an element of the prima facie case); *see also Morisky v. Broward County,* 80 F.3d 445, 448 (11th Cir. 1996) (Americans with Disabilities Act case, citing *Hedberg* ). This Court in *Landefeld* used the burden-shifting analysis because the plaintiff had no direct evidence of defendant's subjective intent and the defendant articulated a nondiscriminatory reason for plaintiff's

---

**9.** The Supreme Court in *McDonnell Douglas* stated that the plaintiff there had to establish that: 1) he or she belongs to a protected class; 2) he or she applied and was qualified for a job for which the employer was seeking applicants; 3) despite his or her qualifications the applicant was rejected; and 4) after rejection the position remained open and the employer continued to seek applicants from persons of complainant's qualifications. *McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. at 1824; *but see id.* at 802 n. 13, 93 S.Ct. at 1824 n. 13 (stating that "[t]he facts necessarily vary in Title VII cases, and the specification above of the prima facie proof required from [plaintiff] is not necessarily applicable in every respect to differing factual situations").

844

dismissal unrelated to his handicap. Given that the purpose of plaintiff's prima facie case where no direct evidence of intent is available is to give the plaintiff the benefit of a rebuttable presumption of discriminatory intent if he or she establishes the prima facie case, *St. Mary's Honor Ctr.*, 509 U.S. 502, 506, 113 S.Ct. 2742, 2746–47, 125 L.Ed.2d 407 (1993), the plaintiff must establish, as an element of his or her prima facie case, that the defendant knew or believed that the plaintiff was disabled, or knew of the plaintiff's symptoms that were caused by the disability. *See also Monette*, 90 F.3d at 1185 (discussing the nature and function of the prima facie case in a handicap discrimination case). This is a logical element to the plaintiff's prima facie case in a Rehabilitation Act case because, unless the grantee knew or believed that the plaintiff was disabled, or knew that the symptoms were caused by a disability as defined by law, it would be impossible for the grantee to have made its decision *because of* the disability, let alone *solely because of* the disability. Where the plaintiff cannot prove employer knowledge or belief, there is no reasonable basis for extending to the plaintiff the inference that the employer discriminated "solely because of" the plaintiff's disability.

■■■■■ Burns failed to present any evidence to contradict the affidavit testimony of the four of the seven Board members who claim to have been unaware of Burns's injury when they made their decision to recommend his termination. *See Affidavits* of Gerald Perrigo, Dewey Dean, Stephen Gammill, Walter Distelzweig. Therefore, Burns has not established his prima facie case. Also, because Burns's diagnosis of reflex sympathetic dystrophy did not occur until well after his termination, no Board member or the Safety Director could have known that this was the basis for his disability. Furthermore, even if Burns had established his prima facie case, thereby raising a rebuttable presumption that he was discharged solely because of his disability, Burns has not carried his burden under *McDonnell Douglas/Burdine* to show that the City's proffered legitimate reasons for terminating him are pretextual. In short, Burns has offered insufficient evidence to create a factual dispute that the City terminated him for reasons other than his poor performance.

■■■■■ In order to prove that the City's asserted reasons are pretextual, Burns must show that the City's asserted reasons have no basis in fact, that the reasons did not in fact motivate the discharge, or, if they were factors in the City's decision, that they were jointly insufficient to motivate the discharge. *Maddox v. University of Tennessee*, 62 F.3d 843, 848 (6th Cir.1995) (citing *Chappell v. GTE Prods. Corp.*, 803 F.2d 261, 266 (6th Cir.1986), *cert. denied*, 480 U.S. 919, 107 S.Ct. 1375, 94 L.Ed.2d 690 (1987)). In response to the City's summary judgment motion, Burns must show that a genuine issue of material fact exists as to whether the City's asserted explanation for its action is a mere pretext for discrimination. Burns insists that he has done so. He notes first that he was terminated almost immediately after announcing his intention to seek injury leave. Second, he states that Officer Chenevey knew of Burns's neck injury, and had previously voiced concern about keeping an injured recruit on the payroll. Third, Burns claims that he was never counseled that his performance was inadequate, but rather Ralls recommended his advancement. Fourth, Burns suggests that his off-duty conduct led to a minor reprimand that did not justify termination. By comparison, he notes that Officer Larry Wilson was not terminated despite his problems with writing and his quarrel with a field officer. Similarly, Burns alleges that Officer James Marable showed poor writing skills and judgment, but was not terminated. Finally, Burns insists that before he was terminated, Officer Jordan allowed him the option of resigning and receiving a good recommendation for another police force. Burns cites these facts as evidence that the defendant's purported reasons for terminating him were pretextual.

None of these arguments, however, can support Burns's claim that the asserted reasons for his termination were pretextual. As stated above, four of the Board members were unaware of Burns's neck injury when they recommended his termination and

Burns does not dispute that their stated reasons are not supported by his record while in training and on probation. Also, because Burns's diagnosis of reflex sympathetic dystrophy did not occur until well after his termination, no Board member or the Safety Director could have based their decision on Burns's condition. Burns insists, though, that Officer Chenevey did not want to keep an injured officer on the force. However, Burns has not shown that Officer Chenevey's opinion was shared by others on the Board or by the Safety Director (who had the authority to terminate him). In fact, Officer Chenevey's affidavit establishes that the Board did not discuss Burns's neck injury during its deliberations. "When the FTO Board met to review Burns' performance, no one discussed his neck injury, to my knowledge and recollection." *Affidavit of Officer Chenevey,* paragraph 10. Moreover, in response to his claim that he was not counseled before his termination, Burns offers no evidence that the City was required to do so, or that the Board was required to accept Ralls's recommendation to release him from training. With regard to Burns's argument that he was more harshly treated than other officers who received minor reprimands, we note that the record does not contain the full personnel files of Officers Wilson and Marable; however, the evidence in the record fails to show that they were involved in the kind of off-duty misconduct exhibited by the plaintiff. Finally, accepting as true Burns's claim that he was given an opportunity to resign and receive a favorable recommendation, we note that Burns has presented no evidence that the offer was sparked by discriminatory intent or linked to the Board's decision. For these reasons, Burns has failed to show any evidence of pretext.

Burns has failed to sustain his burden of presenting a genuine issue of material fact as to one element of his prima facie case and, even if we assume that he has established his prima facie case, he has failed to show that the City's proferred legitimate reasons for terminating him are untrue. The City, therefore, is entitled to judgment as a matter of law. As Burns does not appeal the district court's dismissal of his state law claim, we AFFIRM the district court's decision in its entirety.