Claude WILLIAMS, Plaintiff,

v.

CARGILL, INC., Defendant.

No. C–3–99–83.

United States District Court,
S.D. Ohio,
Western Division.

March 5, 2001.

David Stenson, Dayton, OH, for Plaintiff.

Louise Brock, Laura Herrelson, Cincinnati, OH, for Defendant.

DECISION AND ENTRY SUSTAINING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (DOC. # 22); DEFENDANT'S UNOPPOSED MOTION TO STRIKE (DOC. # 33) SUSTAINED; DEFENDANT'S MOTION FOR CONTEMPT (DOC. # 20) OVERRULED, AS MOOT; JUDGMENT TO BE ENTERED IN FAVOR OF DEFENDANT AND AGAINST PLAINTIFF; TERMINATION ENTRY

RICE, Chief Judge.

This litigation stems from the termination of Plaintiff Claude Williams' employment with Defendant Cargill, Inc., purportedly for insubordination, time card falsification and sleeping on the job. Following his termination, Williams, a union member, filed a grievance and attempted to obtain reinstatement through arbitration. After a labor arbitrator ruled against Williams, calling his case a "slam-dunk" loser, he commenced the present litigation. In a four-Count Complaint (Doc. # 1), Williams alleges that Cargill fired him because of his race, in violation of 42 U.S.C. § 2000e ("Title VII"), 42 U.S.C. § 1981, Ohio Revised Code § 4112.99 and Ohio Revised Code § 4112.02. Pending before the Court are three Motions filed by Cargill: (1) a Motion for Summary Judgment (Doc. # 22); (2) a Motion to Strike (Doc. # 33); and (3) a Motion for Contempt (Doc. # 20).

I. *Factual Background* [1]

Claude Williams began working as a material handler for Cargill in 1992.

---

1. For purposes of ruling on the Defendant's Motion for Summary Judgment, the Court will construe the facts, and all reasonable inferences drawn therefrom, in a light most favorable to the Plaintiff, who is the non-moving party. In its substantive analysis, *infra,* the Court will recite additional pertinent

(Williams depo. at 27). The company terminated his employment on October 27, 1997. (*Id.* at 349). The events leading to his termination occurred over a 10 hour period in late October, 1997. Williams clocked in for work at approximately 3:00 p.m. on October 20, 1997, despite the fact that his shift did not start until 11:00 that night. (Williams depo. at 284–285, 287). He did so in order to be on time for a voluntary company meeting, which was scheduled to begin at 4:00 p.m. (*Id.* at 285). The purpose of the meeting was to "reflect over that year's business" and to celebrate "a quality job well done." (*Id.* at 274). Prior to the meeting, Williams received an E-mail message from Cargill supervisor Terry Dean. In relevant part, the message stated:

IF YOU PLAN TO ATTEND THIS MEETING, IT IS YOUR RESPONSIBILITY TO CLEAR IT WITH YOUR IMMEDIATE SUPERVISOR & BE SURE PROPER COVERAGE CAN BE ARRANGED. FOLKS WILL BE PAID FOR THE TIME INVOLVED AT THE MEETING. IMMEDIATELY FOLLOWING THIS MEETING, THE GROUP WILL MEET AT 6–6:15P[M] AT THE BARNSIDER FOR DINNER.

(Dean affidavit, Doc. # 22 at Exh. C).

Although Williams received the foregoing E-mail message, he did not open it. Instead, he learned of the scheduled meeting by "word of mouth." (Williams depo. at 272–273). Based on "past practice," Williams also anticipated that he would receive a full eight hours of pay for attending the meeting and the dinner, despite the fact that he was not scheduled to work until third shift, which started at 11:00 p.m. (*Id.* at 276–277).

After clocking in at 3:00 p.m. on October 20, 1997, Williams did not perform any work while waiting for the meeting to begin. (*Id.* at 292–293). At approximately 4:00 p.m., the meeting started as planned. Near the end of the meeting, Williams became upset upon discovering that he was required to pick one of four pre-selected entrees for dinner at the Barnsider restaurant. One of the four entrees was T-bone steak. The other three options were chicken dishes. (*Id.* at 295). Williams perceived the predominance of chicken entrees as an example of Cargill's stereotyping of African–Americans. (*Id.* at 299). Upon arriving at the Barnsider, Williams also became upset when he learned that Cargill was not running a bar tab for its employees. (*Id.* at 306–308). He expressed his dissatisfaction to Cargill supervisor Ron Lewis, who permitted him to order anything he wanted from the menu. (*Id.* at 303). With respect to the issue of a bar tab, Lewis explained that the company had concerns about its employees drinking and driving or being sober enough to return to work after dinner. (*Id.* at 308). Lewis then sat next to Williams at a reserved table. (*Id.* at 312). Shortly thereafter, Williams told Lewis that "it seems like a bad day when Cargill can't afford Barnsider." (*Id.* at 313). In response, Lewis pointed a finger at Williams and said, "I don't care what you say, you're wrong." (*Id.*). Williams then "loudly" told Lewis, "I can buy you, motherfucker." (*Id.* at 314–315). When Lewis failed to respond, Williams left the restaurant and sat in his car to "calm down." (*Id.* at 314, 317). After 45 minutes, he went back inside but did not eat his dinner. (*Id.* at 316, 320, 322).

facts, again construing those facts and all reasonable inferences most strongly in favor of the Plaintiff.

Around 9:00 p.m., Williams left the Barnsider and returned to Cargill. (*Id.* at 322). Prior to his scheduled 11:00 p.m. shift, he made a telephone call, picked up work clothes from the starch department, talked to a union steward and started helping a second-shift employee with his work. (*Id.* at 322–325). Shortly after midnight, following the start of Williams' scheduled shift, Cargill supervisor Brian Schuler observed him slumped over with his head down, apparently asleep. (Schuler affidavit, Doc. #22 at Exh. F). Schuler also spoke to Williams, who did not respond. (*Id.*). Williams admits that he was asleep on the job for at least some period of time beyond an allowed break.[2] (Williams depo. at 337, 339, 341). After discovering Williams asleep on the job, Schuler told him to clock out and informed him that he would be contacted to return for a meeting about his conduct. (Schuler affidavit, Doc. #22 at Exh. F).

Thereafter, Cargill began investigating the incidents of October 20–21, 1997. (Holler affidavit, Doc. #22 at Exh. A). On October 23, 1997, supervisor Greg Holler told Williams that he was "suspended for discharge effective immediately." (*Id.*). Holler informed Williams that he was being disciplined for: (1) sleeping on the job; (2) time card/work hour violations; (3) unacceptable and insubordinate behavior toward management; and (4) his prior work record.[3] (*Id.*).

Williams subsequently attended a disciplinary meeting, where he was able to give an explanation for the events that occurred on October 20–21, 1997.[4] (Vocke affidavit, Doc. #22 at Exh. E). Following that meeting, Cargill managers Al Johnson and Greg Holler terminated Williams' employment for engaging in the aforementioned conduct, which violated the terms of his Collective Bargaining Agreement. (Holler affidavit, Doc. #22 at Exh. A; Vocke affidavit, *Id.* at Exh. E, Tab 1). Williams then filed a grievance, which was denied at all steps. (*Id.* at Exh. E). The matter proceeded to arbitration, and a labor arbitrator ultimately ruled against Williams, calling the case a "slam-dunk." (*Id.* at Tab 2). After filing a charge of race discrimination with the Ohio Civil Rights Commission, Williams commenced the present litigation on February 26, 1999, by filing his four-Count Complaint (Doc. #1).

## II. *Summary Judgment Standard*

The Court first will set forth the parties' relative burdens once a motion for summary judgment is made. Summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

Of course, [the moving party] always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of

---

2. Cargill contends that Williams' supervisor, Brian Schuler, observed him sleeping for approximately 45 minutes. (Schuler affidavit, Doc. #22 at Exh. F). In his deposition, Williams admitted sleeping on the clock, but he testified that he was asleep for "at most" 10 minutes beyond an allowed break time. (Williams depo. at 339). For present purposes, the Court must accept as true Williams' claim that he was asleep for no more than 10 minutes following an allowed break.

3. Although Holler did not elaborate on the "prior work record" justification, Cargill notes in its Memorandum that Williams previously had been suspended for sleeping on the job. (Holler affidavit, Doc. #22 at Exh. A).

4. Neither Cargill nor Williams has informed the Court what he said in his defense during the disciplinary meeting.

"the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact. *Id.* at 323, 106 S.Ct. 2548. *See also Boretti v. Wiscomb,* 930 F.2d 1150, 1156 (6th Cir. 1991) (The moving party has the "burden of showing that the pleadings, depositions, answers to interrogatories, admissions and affidavits in the record, construed favorably to the non-moving party, do not raise a genuine issue of material fact for trial[,]" quoting *Gutierrez v. Lynch,* 826 F.2d 1534, 1536 [6th Cir.1987] ). The burden then shifts to the non-moving party who "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (quoting Fed.R.Civ.P. 56(e)). Thus, "[o]nce the moving party has met its initial burden, the nonmoving party must present evidence that creates a genuine issue of material fact making it necessary to resolve the difference at trial." *Talley v. Bravo Pitino Restaurant, Ltd.,* 61 F.3d 1241, 1245 (6th Cir.1995). Read together, *Liberty Lobby* and *Celotex* stand for the proposition that a party may move for summary judgment by demonstrating that the opposing party will not be able to produce sufficient evidence at trial to withstand a motion for judgment as a matter of law under Fed.R.Civ.P. 50. *Street v. J.C. Bradford & Co.,* 886 F.2d 1472, 1478 (6th Cir.1989).

Once the burden of production has shifted, the party opposing summary judgment cannot rest on its pleadings or merely reassert its previous allegations. It is not sufficient to "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *see also Michigan Protection and Advocacy Service, Inc. v. Babin,* 18 F.3d 337, 341 (6th Cir.1994) ("The plaintiff must present more than a scintilla of evidence in support of his position; the evidence must be such that a jury could reasonably find for the plaintiff"). Rather, Rule 56(e) "requires the non-moving party to go beyond the [unverified] pleadings" and present some type of evidentiary material in support of its position. *Celotex Corp.,* 477 U.S. at 324, 106 S.Ct. 2548. Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). Summary judgment shall be denied "[i]f there are ... 'genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party.'" *Hancock v. Dodson,* 958 F.2d 1367, 1374 (6th Cir.1992). Of course, in determining whether a genuine issue of material fact exists, a court must assume as true the evidence of the nonmoving party and draw all *reasonable* inferences in the favor of that party. *Anderson,* 477 U.S. at 255, 106 S.Ct. 2505 (emphasis added). If the parties present conflicting evidence, a court may not decide which evidence to believe, by determining which parties' affiants are more credible; rather, credibility determinations must be left to the fact-finder. 10A Charles Alan Wright, *et al., Federal Practice and Procedure* § 2726.

In ruling on a motion for summary judgment (in other words, in determining whether there is a genuine issue of material fact), "[a] district court is not ... obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim." *InterRoyal Corp. v. Sponseller,* 889 F.2d 108, 111 (6th Cir.1989), *cert. denied,* 494 U.S. 1091, 110 S.Ct. 1839, 108 L.Ed.2d 967 (1990); *see also L.S. Heath &*

*Son, Inc. v. AT & T Information Systems, Inc.,* 9 F.3d 561 (7th Cir.1993); *Skotak v. Tenneco Resins, Inc.,* 953 F.2d 909, 915 n. 7 (5th Cir.) ("Rule 56 does not impose upon the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment . . . ."), *cert. denied,* 506 U.S. 832, 113 S.Ct. 98, 121 L.Ed.2d 59 (1992). Thus, a court is entitled to rely, in determining whether a genuine issue of material fact exists on a particular issue, upon only those portions of the verified pleadings, depositions, answers to interrogatories and admissions on file, together with any affidavits submitted, specifically called to its attention by the parties.

III. *Defendant's Motion for Summary Judgment (Doc. # 22) and Unopposed Motion to Strike Affidavits (Doc. # 33)*

Cargill seeks summary judgment on each of the four Counts in Williams' Complaint (Doc. # 1). As a means of analysis, the Court first will address the two federal-law claims, which arise under Title VII and 42 U.S.C. § 1981. The Court then will turn to the state-law claims, which Williams asserts under Ohio Revised Code Chapter 4112.

A. *Title VII and 42 U.S.C. § 1981*

In Counts I and II of his Complaint, Williams alleges that Cargill fired him because of his race, in violation of Title VII and 42 U.S.C. § 1981.[5] It is well settled that a plaintiff pursuing a race discrimination claim under Title VII or § 1981 may prevail by presenting either direct or indi-rect evidence to prove that his employer was motivated by a race-based animus when it took an adverse employment action against him. Absent direct evidence of race discrimination, which Williams does not purport to possess, a plaintiff must proceed under the burden-shifting, indirect evidence approach set forth in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Under that framework,

a plaintiff bears the burden of establishing by a preponderance of the evidence a prima facie case and creating a presumption of discrimination by demonstrating: (1) membership in the protected class; (2) that [he] suffered an adverse action; (3) that [he] was qualified for the position; and (4) that [he] was replaced by someone outside the protected class or was treated differently from similarly situated members of the unprotected class. *See Mitchell v. Toledo Hosp.,* 964 F.2d 577, 582–83 (6th Cir.1992) (citing *McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. 1817, 36 L.Ed.2d 668).

Once the plaintiff establishes a prima facie case, an inference of discrimination arises. The burden of production then shifts to the employer to articulate a legitimate, nondiscriminatory reason for the plaintiff's discharge. *McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. 1817, 36 L.Ed.2d 668. The plaintiff then assumes the final burden of proving that an employer's articulated nondiscriminatory reason for taking an adverse action towards him was unlawfully pretextual. *See Mitchell,* 964 F.2d at 584 n. 6. The

5. The Court will address Williams' Title VII and 42 U.S.C. § 1981 claims together, given that the same analytical framework is employed under both provisions. *See Daniels v. Board of Education of Ravenna City School District,* 805 F.2d 203, 207 (6th Cir.1986) ("[T]he order and allocation of proof, applicable in a disparate treatment case under Title VII, may be utilized in adjudicating race discrimination claims arising under sections 1981 and 1983."); *Shah v. General Elec. Co.,* 816 F.2d 264, 267 n. 1 (6th Cir.1987) ("The order and allocation of proof in a section 1981 case are the same as in a Title VII action.").

plaintiff must prove "that the [employer's] asserted reasons have no basis in fact, that the reasons did not in fact motivate the discharge, or, if they were factors in the [employer's] decision, that they were jointly insufficient to motivate the discharge." *Burns v. City of Columbus*, 91 F.3d 836, 844 (6th Cir.1996). *Warfield v. Lebanon Correctional Inst.*, 181 F.3d 723, 728 729 (6th Cir.1999).

In the present case, Cargill does not dispute Williams' ability to satisfy the first three elements of his prima facie case. It challenges only his ability to satisfy the fourth element. With respect to that element, Williams does not allege that a non-minority employee replaced him. Rather, he alleges only that Cargill treated him differently than similarly-situated Caucasian employees. (*See* Complaint, Doc. # 1 at ¶ 20; Memorandum in Opposition to Summary Judgment, Doc. # 29).

When comparing himself to other "similarly-situated" white employees, Williams must show that these "comparables" are similarly-situated "in all of the relevant aspects." *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 352 (6th Cir. 1998) (quoting *Pierce v. Commonwealth Life Ins. Co.*, 40 F.3d 796, 802 (6th Cir. 1994)). In other words, similarly-situated employees generally "must have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." *Mitchell*, 964 F.2d at 583; *see also Ercegovich*, 154 F.3d at 352 (recognizing that the foregoing factors "generally are all relevant considerations in cases alleging differential disciplinary action").

With the foregoing standards in mind, the Court concludes that Cargill is entitled to summary judgment on Counts I and II of Williams' Complaint, because he cannot satisfy the fourth element of his prima facie case. In its Motion for Summary Judgment, Cargill insists that it fired Williams for a combination of reasons. Specifically, Cargill contends that, within a ten-hour period, Williams (1) clocked in for time that he did not work; (2) engaged in insubordinate behavior at the Barnsider when he called Ron Lewis, his supervisor, a "motherfucker" in front of co-workers and other patrons; and (3) slept on the job after returning from the restaurant. (Defendant's Memorandum, Doc. # 22 at 1).

Notably, Williams does not dispute clocking in at approximately 3:00 p.m., despite not being scheduled to work until 11:00 p.m.[6] (Williams depo. at 284–285,

---

**6.** In his deposition, Williams explained that he clocked in for the 3:00 p.m. to 11:00 p.m. shift because he thought, based on "past practice," that employees who attended the voluntary 4:00 p.m. meeting and the following dinner at the Barnsider were entitled to receive eight hours of pay, even if they were not scheduled to work second shift. (Williams depo. at 276–279). Williams' understanding of his entitlement to eight hours of compensation conflicts with the E-mail that his department manager, Terry Dean, sent to him several days before the meeting and dinner. In relevant part, the E-mail stated that "FOLKS WILL BE PAID FOR TIME INVOLVED AT MEETING." (Dean affidavit, Doc. # 22 at Exh. C). Although Williams does not deny

Dean sending him the E-mail, he never opened it. (Williams depo. at 272).

Even if Williams sincerely believed that he was to receive eight hours of pay for attending the meeting and dinner, however, he *does not* suggest that Cargill lacked a *reasonable basis* for concluding that he had fraudulently clocked in for time that he had not worked. *Cf. Smith v. Chrysler Corp.*, 155 F.3d 799, 806–807 (6th Cir.1998) (recognizing that an employer may take an adverse employment action against an employee based on an erroneous belief that the employee has engaged in misconduct, provided that the employer honestly believed that such misconduct had occurred and its belief was reasonably based on particularized facts).

287). Williams also admits not doing any work from 3:00 p.m. to 4:00 p.m., after clocking in and while waiting for the meeting to begin. (*Id.* at 292–293). Nor does Williams deny "loudly" calling Lewis a "motherfucker" during the company dinner at the Barnsider. (*Id.* at 313–315). Finally, Williams does not dispute sleeping on the job for at least some period of time beyond his allowed break.[7] (*Id.* at 339, 341).

In his Memorandum opposing summary judgment, however, Williams insists that non-minority Cargill employees have engaged in similar misconduct without being fired.[8] (*See, generally,* Doc. # 29). In support, Williams provides several affidavits to establish that Cargill has failed to terminate white employees who were caught sleeping on the job.[9] Cargill employee Walter Bailey avers generally that "[m]anagement has inconsistently applied the policy of sleeping on the job."[10] (*Id.* at Exh. 3). Bailey also states that "[t]o our knowledge there ha[ve] been no white employees terminated in the last 27 years at Cargill for sleeping on the job."[11] (*Id.*). Similarly, Cargill employee James Gilbert avers generally that "more black employees appear to be disciplined for sleeping on the job than their [C]aucasian counterparts, despite the [C]aucasian employees possessing a majority of the plant."[12] (*Id.* at

---

7. Cargill contends that Williams' supervisor, Brian Schuler, observed him sleeping for approximately 45 minutes. (Schuler affidavit, Doc. # 22 at Exh. F). In his deposition, Williams admitted sleeping on the clock, but he testified that he was asleep for "at most" 10 minutes beyond an allowed break time. (Williams depo. at 339).

8. In opposition to summary judgment, Williams does not cite or otherwise rely upon his own 406–page deposition transcript. It is well-established that the Court has no independent obligation to review that transcript in search of evidence demonstrating the existence of a genuine issue of material fact. *See, e.g., InterRoyal Corp.,* 889 F.2d at 111 (recognizing that "[a] district court is not ... obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim").

9. Two of those "affidavits" are the subject of an unopposed Motion to Strike (Doc. # 33) filed by Cargill. In support of its Motion, Cargill notes that a purported affidavit from employee Karl Williams is signed by the affiant but not sworn. (*See* Doc. # 29 at Exh. 2). With respect to a purported affidavit from employee Averon Ely, Cargill notes that it is neither signed by the affiant nor sworn. (*Id.* at Exh. 4). Cargill filed its unopposed Motion to Strike on June 30, 2000 (Doc. # 33). Since that time, Williams done nothing to remedy the deficiencies pointed out by Cargill. The Sixth Circuit has recognized that a district court may not consider unsworn statements when ruling on a summary judgment motion. *Dole v. Elliott Travel & Tours, Inc.,* 942 F.2d 962, 968–969 (6th Cir.1991). Accordingly, Cargill's unopposed Motion to Strike the "affidavits" of Karl Williams and Averon Ely is sustained. The Court will not consider the unsworn statements when ruling on the present *Motion for Summary Judgment.*

10. Bailey also avers that "[m]anagement has inconsistently applied the open door policy for overtime." (Doc. # 29 at Exh. 3). Unfortunately, he provides no elaboration or factual context to explain the significance of this conclusory statement or how it helps establish the final element of Williams' prima facie case.

11. Bailey appears to make this statement in his capacity as President of the labor union at Cargill. (*See* Doc. # 29 at Exh. 3).

12. Gilbert also avers, without elaboration, that he once saw a "hangman's noose in the starch department" in 1998. (Doc. # 29 at Exh. 6). Absent additional facts about this incident, it does little, if anything, to support Williams' present claim that he was fired because he is black. For example, Gilbert does not aver that Williams' supervisors placed the noose in the starch department. Nor does he allege that Williams' supervisors knew who placed the noose in the starch department and failed to discipline them. Instead, Gilbert avers only that his supervisor, Mick Sheets, indicated that no photograph of the

Exh. 6). Cargill employee Brian Beaty avers generally that he has "witnessed discriminatory conduct by the management of Defendant Cargill, Inc., directed towards black employees." (*Id.* at Exh. 8). Beaty also avers that Cargill supervisors have found white employees asleep on the job and not disciplined them. (*Id.* at ¶ 4–5). Likewise, Cargill employee Gwen Marlowe avers that white employees and managers have been found asleep at work without being punished.[13] (*Id.* at Exh. 9).

In addition to the foregoing affidavits, Williams cites deposition testimony from Cargill employees Wade Hensley, Michael Ogle and Naomi Gordon.[14] (Doc. # 29 at Exh.1, 5, 7). Hensley believes that the company has applied its policy against sleeping on the job in an inconsistent fashion. According to Hensley, some people caught sleeping on the job are allowed to resign, others are fired, and still others are simply shaken awake. (*Id.*, Exh. 1 at 19, 25). Although he cannot prove it, Hensley believes that "disciplinary action has not been applied fairly to black and white [employees]." (*Id.* at 20). Hensley recalls a time when blacks were disciplined more severely than whites, but he also recalls a time when the opposite was true.[15] (*Id.* at 21–22). In his deposition, Ogle explained that he once saw a white supervisor awaken a sleeping white employee who was not disciplined. (*Id.*, Exh. 5 at 19–20, 35). Ogle also believes that white Cargill employees sometimes "get away with stuff" when African–Americans do not. (*Id.* at 31). In her deposition, Gordon stated that she is unaware of Williams ever falling asleep on the job.[16] (*Id.*, Exh. 7 at 39).

---

noose was taken. The relevance of this fact is not apparent to the Court, and Gilbert provides no explanation. In any event, the Court notes that, within a week of the incident, Cargill circulated a memorandum informing employees that "there will be no kind of racial signs or anything like that being put up in the plant...." (Ogle depo. at 26).

13. Marlowe also makes several other conclusory averments. In particular, she states: (1) that she was laid off and not brought back, despite having seniority; (2) that there are few blacks in management positions at Cargill; (3) that she was "bumped" from her position by an unqualified white employee; and (4) that she once received discipline for getting into a "verbal altercation" with a white male, who was not similarly disciplined. (Doc. # 29 at Exh. 9). Once again, absent additional information, the foregoing averments do little, if anything, to support Williams' present claim of race discrimination. As a threshold matter, Marlowe's averments are devoid of any factual context. Consequently, their significance is difficult to evaluate. In addition, Marlowe provides absolutely no information to suggest that Williams' supervisors had anything to do with her being laid off, her being "bumped," or her being disciplined for a "verbal altercation." In any event, Marlow's averments are unrelated to Williams' ability to establish the final element of his prima facie case.

14. For present purposes, the Court will assume, arguendo, that Exhibits 1, 5 and 7 accompanying Williams' Memorandum opposing summary judgment (Doc. # 29) are, as they purport to be, transcribed excerpts from the deposition testimony of Hensley, Ogle and Gordon. Given that Williams has neither filed the full transcripts nor authenticated the excerpts, they do not constitute proper Fed. R.Civ.P. 56 evidence. Nevertheless, the Court has considered them in ruling on the Defendant's Motion for Summary Judgment and discerns no purpose in requiring Williams to authenticate the excerpts, in light of its determination herein that Cargill is entitled to summary judgment on all four Counts of his Complaint.

15. Hensley also testified that he once observed the letters "KKK" written with silicone on an elevator wall. (Doc. # 29, Exh. 1 at 32). Hensley scraped the silicone off of the wall with his knife. (*Id.*). Someone later painted over the remaining marking. (*Id.*).

16. Given that Williams admits sleeping for some period of time on the day in question, the fact that Gordon never saw him asleep has little relevance.

In response to the foregoing evidence, Cargill argues that the other employees who allegedly were caught sleeping on the job are not "similarly-situated" with Williams for several reasons: (1) the incidents mentioned by Williams involved employees who had different supervisors, (2) the decision-makers with respect to Williams' termination were unaware of these other incidents of sleeping on the job; and (3) the individuals mentioned by Williams did not engage in the same (or similar) misconduct that he did. (*See, generally,* Doc. # 22 and Doc. # 34).

Upon review, the Court agrees that the employees with whom Williams seeks to compare himself are not "similarly-situated" with him in all "relevant aspects," as a matter of law. In reaching this conclusion, the Court will assume, purely arguendo, that the white Cargill employees caught sleeping on the job *did* have the same supervisor as Williams. The Court also will assume, purely arguendo, that the decision-makers with respect to Williams' termination *were* aware of these other incidents of sleeping on the job.[17] Even if the foregoing assumptions are true, Williams cannot establish a prima facie case for the *third* reason cited by Cargill. The individuals mentioned by Williams simply did not engage in the same (or similar) misconduct that led to his termination.

In his Memorandum opposing summary judgment, Williams argues at length that white Cargill employees have not been fired, despite being caught sleeping on the job. Notably, however, Cargill *did not* fire Williams solely for sleeping on the job. The company fired him for (1) clocking in for hours that he did not work, (2) engaging in insubordinate behavior by calling his supervisor a "motherfucker" at the Barnsider, *and* (3) sleeping on the job, all within a ten-hour period.[18] Williams has identified *no* other Cargill employee who retained his or her employment, despite committing similar acts of comparable seriousness, within a relatively short period of time. In reaching this conclusion, the Court finds instructive the Sixth Circuit's analysis in *Warfield v. Lebanon Correctional Inst.,* 181 F.3d 723 (6th Cir.1999). Therein, the plaintiff-appellant attempted to show that the defendant-appellee treated her differently than similarly-situated male employees.[19] Upon review, the Sixth Circuit reasoned:

> The only evidence that Warfield brings forth in her effort to show pretext arguably establishes only that other male probationary corrections officers at Lebanon were not terminated for committing *some* of the acts she had committed. In essence, Warfield contends that a hypothetical Title VII plaintiff, terminated for committing acts A, B, C, D, and E, can use as her *sole evidence* of pretext the fact that a co-worker outside the protected class was not terminated for committing act B, and another co-

---

17. Although Cargill disputes these issues, the Court may indulge in such assumptions because Cargill is entitled to summary judgment even if the assumptions are true.

18. In addition, Cargill notes that Williams previously had been suspended for sleeping on the job. (Holler affidavit, Doc. # 22 at Exh. A).

19. In *Warfield,* the Sixth Circuit conducted its "similarly-situated" analysis in the context of the plaintiff's attempt to show that her em-

ployer's non-discriminatory reason for her termination was pretextual. The same "similarly-situated" analysis is also routinely applied at the prima facie stage when, as in the present case, a plaintiff attempts to satisfy the final element of his prima facie case with evidence that similarly-situated employees were treated better. In fact, *Warfield* itself cites case law addressing the "similarly-situated" issue in the contest of a plaintiff's prima facie case. *See Warfield,* 181 F.3d at 730 (citing *Mitchell v. Toledo Hosp.,* 964 F.2d 577, 582–583 (6th Cir.1992)).

worker outside the class was not terminated for committing act E.

This is simply wrong.[20] It is the discrimination plaintiff's burden to establish that the other employee's acts were of "comparable seriousness" to his or her own infraction. *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 n. 5 (6th Cir. 1992) (citation omitted). In the hypothetical above, for example, the plaintiff would have to at least establish that a similarly-situated male employee who committed acts A, B, C, D, and E (or, perhaps, acts "comparably serious" to acts A, B, C, D, and E) was not terminated. Here, Warfield has presented no evidence that even remotely establishes that her alleged failings were of "comparable seriousness" to those of similarly-situated male employees. Since this was plaintiff's only evidence of pretext, a jury could not reasonably find that Lebanon's numerous asserted reasons for her termination were pretextual and, therefore, summary judgment was proper.

*Id.* at 730–731.

In the present case, Williams, who was fired for committing acts A (time card falsification), B (insubordination) and C (sleeping on the job), attempts to establish that he was treated differently than non-minority Cargill employees who committed act C (sleeping on the job). As *Warfield* makes clear, Williams is not "similarly-situated" with these white Cargill employees who were caught sleeping on the job.[21]

---

20. By noting that a plaintiff cannot use as her "sole evidence of pretext" the fact co-workers committed *some* of the acts that led to her discharge, the *Warfield* court appears to have acknowledged that a discrimination plaintiff may establish pretext in other ways. As noted, *supra,* a discharged employee may show pretext by presenting evidence "that the [employer's] asserted reasons have no basis in fact, that the reasons did not in fact motivate the discharge, or, if they were factors in the [employer's] decision, that they were jointly insufficient to motivate the discharge." *Burns,* 91 F.3d at 844. In the context of a pretext analysis, a plaintiff seeks to compare himself to "similarly-situated" employees in order to prove pretext under the third approach. By showing that similarly-situated employees were not terminated, despite engaging in the same or similar misconduct, a plaintiff raises a genuine issue of material fact as to whether the misconduct was truly "sufficient" to motivate his discharge. *See, e.g., Manzer v. Diamond Shamrock Chemicals Co.,* 29 F.3d 1078, 1084 (6th Cir.1994). Although a discrimination plaintiff cannot establish pretext merely by showing that other employees engaged in *some* of the misconduct that led to his termination, the *Warfield* court implicitly recognized that such a plaintiff might establish *pretext* under one of the other two methods. In the present case, however, the record *must* contain evidence from which a trier of fact could find that Cargill treated Williams worse than "similarly-situated" non-minority employees. Otherwise, he cannot satisfy the final element of his *prima facie* case.

21. In support of its Motion for Summary Judgment, Cargill also notes an allegation in Williams' deposition testimony that a white employee named Paul Clausing once threw a hard hat at his supervisor and was not fired. (Doc. # 22 at 13) (citing Williams depo. at 365–366). The Court has not addressed this incident because Williams does not rely upon it in his Memorandum opposing summary judgment. In any event, Williams' testimony about the hat-throwing incident is insufficient to satisfy the final element of his prima facie case for at least three reasons. *First,* his testimony is hearsay, which may well be why he did not cite it in his Memorandum opposing summary judgment. Williams has no personal knowledge about the hat-throwing incident. (Williams depo. at 366). He heard about it from another employee. (*Id.*). *Second,* there is no evidence that Williams and the individual who threw the hard hat share the same decision-maker with respect to the imposition of discipline. *Third,* even if another employee did engage in insubordinate behavior by throwing a hard hat at a supervisor, this fact simply does not support the final element of Williams' prima facie case. As the Sixth Circuit noted in *Warfield,* the fact one employee committed act B (insubordination by throwing a hard hat), while other employees committed act C (sleeping on the job),

As in *Warfield*, Williams "has presented no evidence that even remotely establishes that [his] alleged failings were of 'comparable seriousness' to those of similarly-situated [white] employees." *Id.* at 730–731. As a result, Williams cannot satisfy the final element of his prima facie case, and Cargill is entitled to judgment as a matter of law on his claims arising under Title VII and 42 U.S.C. § 1981.

**B.** *Ohio Revised Code § 4112.02 and § 4112.99*

In Counts III and IV of his Complaint, Williams alleges that Cargill fired him because of his race, in violation of Ohio Revised Code § 4112.02 and § 4112.99.[22] The Ohio Supreme Court has held that "federal case law interpreting Title VII of the Civil Rights Act of 1964 . . . is generally applicable to cases involving alleged violations of R.C. Chapter 4112."[23] *Plumbers & Steamfitters Committee. v. Ohio Civil Rights Comm.*, 66 Ohio St.2d 192, 421 N.E.2d 128 (1981). In the present case, there is *no* difference between Title VII and Ohio Revised Code Chapter 4112, with respect to Court's analysis of Williams' race discrimination allegations against Cargill. Consequently, Cargill is entitled to summary judgment on Counts III and IV of Williams' Complaint for the reasons set forth more fully, *supra*, in the Court's analysis of his Title VII and § 1981 claims.[24]

**IV.** *Defendant's Motion for Contempt (Doc. # 20)*

Also pending before the Court is a Motion for Contempt (Doc. # 20) filed by Cargill. In this Motion, Cargill contends that Brian Beaty, a witness under subpoena, has failed to appear for a scheduled deposition. As a result, the Defendant seeks an Order declaring Beaty in civil contempt and directing him to appear for his deposition.

Upon review, the Court will overrule Cargill's Motion for Contempt, as moot. The primary purpose of a civil contempt order is to compel obedience to the Court. *McMahan & Co. v. Po Folks, Inc.*, 206 F.3d 627, 634 (6th Cir.2000). Given that the Court has sustained Cargill's Motion for Summary Judgment, however, there is no reason to enter a civil contempt Order compelling Beaty to attend a deposition that is no longer necessary. Accordingly,

does not establish that such employees are similarly-situated with Williams, who was fired for committing acts A (time card falsification), B (insubordination) *and* C (sleeping on the job), all within a 10–hour period.

**22.** Ohio Revised Code § 4112.02 makes it unlawful "[f]or any employer, because of the race, color, religion, sex, national origin, handicap, age, or ancestry of any person, to discharge without just cause, to refuse to hire, or otherwise to discriminate against that person with respect to hire, tenure, terms, conditions, or privileges of employment, or any matter directly or indirectly related to employment." Ohio Revised Code § 4112.99 is a remedies provision. It provides that "[w]hoever violates this chapter is subject to a civil action for damages, injunctive relief, or any other appropriate relief."

**23.** In its Motion for Summary Judgment, Cargill asks the Court to analyze Williams' state-law claims under federal Title VII case law. (Doc. # 22 at 11 n. 3).

**24.** Cargill also contends that it is entitled to summary judgment on Williams' state-law race discrimination claims for a second reason. In particular, Cargill argues that Williams' prior resort to the grievance and arbitration process precludes him from bringing an action for race discrimination under Ohio Revised Code Chapter 4112. (Doc. # 22 at 17–18). Given that Cargill is entitled to summary judgment on Williams' state-law race discrimination claims for the reasons set forth in the Court's Title VII analysis, it need not address this alternative argument for entering summary judgment on those claims.

Cargill's Motion for Contempt (Doc. # 20) is overruled, as moot.

## V. *Conclusion*

Based on the reasoning and citation of authority set forth above, the Defendant's Motion for Summary Judgment (Doc. # 22) is sustained. The Defendant's unopposed Motion to Strike Affidavits (Doc. # 33) is sustained. The Defendant's Motion for Contempt (Doc. # 20) is overruled, as moot.

Judgement will be entered in favor of the Defendant and against the Plaintiff.

The captioned cause is hereby ordered terminated upon the docket records of the United States District Court for the Southern District of Ohio, Western Division, at Dayton.