NOT RECOMMENDED FOR PUBLICATION
File Name: 15a0624n.06

No. 14-3960

FILED
Sep 03, 2015
DEBORAH S. HUNT, Clerk

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| JOHN YARBERRY, | ) | |
| | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | ON APPEAL FROM THE UNITED |
| v. | ) | STATES DISTRICT COURT FOR |
| | ) | THE SOUTHERN DISTRICT OF |
| GREGG APPLIANCES, INC., | ) | OHIO |
| | ) | |
| Defendant-Appellee. | ) | OPINION |
| | ) | |
| | ) | |

BEFORE:    KEITH, CLAY, and STRANCH, Circuit Judges.

**STRANCH, Circuit Judge**.  Gregg Appliances ("Hhgregg") terminated an employee, John Yarberry, after he exhibited bizarre behavior over the course of two days, including misconduct at a company store, and was subsequently involuntarily committed to a psychiatric hospital.  Yarberry sued, alleging violations of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12112, and both parties filed cross motions for summary judgment.  The district court granted summary judgment to Hhgregg and Yarberry appealed.  Although Yarberry can establish a prima facie case of discrimination under the ADA, Hhgreg's conduct-based reasons for termination were nondiscriminatory and Yarberry cannot prove those reasons were pretextual.  Yarberry's failure to accommodate claim also fails, as Hhgregg did not have to accommodate him after terminating him for misconduct.  We therefore AFFIRM the district court's grant of summary judgment to Hhgregg.

## I.  BACKGROUND

Hhgregg first hired Yarberry as a sales associate in a Cincinnati store in October 2010, promoted him to management training in February 2011, and offered him a position as an Appliance Sales Manager in its Cranberry, Pennsylvania store in July 2011.  However, Yarberry's first day of work at the Cranberry store, on August 1, 2011, also proved to be his last with Hhgregg.

### A.  Pertinent Events

#### 1.  Monday, August 1, 2011

Yarberry arrived at the Cranberry store at 7:30 a.m.  He recalled that he had been feeling stressed due to work and personal issues and was unable to sleep for the previous ten or eleven nights.  The day did not go well: Yarberry had a conflict with an employee he was attempting to retrain, as well as with Adam Vozza, another manager, who "came in and screamed at [him]." Panicked, Yarberry attempted to call Brett Edger, the Regional Manager and when Edger arrived at the store in the late afternoon, he talked to Vozza and then to Yarberry, whom he had not met before.  A "manic" Yarberry told Edger that he had not been sleeping and was "starting to freak out," but Edger just told him to return to work the next morning.  Yarberry left work at 9 p.m.

#### 2.  Tuesday, August 2

Later Monday evening Yarberry had a drink at a bar and went to his hotel, but returned to the store around 2:15 a.m. on August 2.  Todd Zimmerman, Hhgregg's National Asset Protection Manager, later viewed surveillance footage that showed Yarberry locking himself in the building, going to the safe in the manager's office, placing a box inside and closing it.  Yarberry then wandered around the store and played on the computers for several hours.  Zimmerman initially believed Yarberry to be "intoxicated," citing "extremely bizarre" behavior that included

"spinning on a chair very fast and shining a light up in the air," "dashing, stopping, moving," and making "strange movements and going fast and then slow." Yarberry's own memory of the night is dim: he recalled lying down on a mattress, going into the safe to either store or retrieve a router he had given Vozza earlier in the day, and watching YouTube videos.

During the early hours of August 2, Yarberry sent a string of increasingly odd text messages and emails to Edger, expressing concern that Vozza would harm him or the store, describing his anxiety about work, and complaining about his inability to sleep. At 3:55 a.m. Yarberry wrote in an email to Edgar that his fiancée was "CONCERNED FOR [HIS] HEALTH AND WANTS TO CHECK [HIM] INTO A HOSPITAL," and that "SHE THINKS I[']M NUTS." Yarberry wrote that he was at the store because he could not sleep and was going to leave and "MIGHT SCREW UP THE ALARM."

At 6:38 a.m., Edger texted Yarberry back, telling him that he would be at the store at 8:00 a.m. and expressing his concern about that morning's communications. In an exchange of texts that began at 7:21 a.m., Yarberry wrote Edger that he was "barely surviving" and not coming in that day, and that his fiancé was trying to get him to a doctor. Edger replied that Yarberry should go to the emergency room or call an ambulance if he needed to.

Meanwhile, beginning at 6:35 a.m., Yarberry emailed five senior Hhgregg corporate executives, none of whom he knew, with subject lines that read "URGENT URGENT URGENT." The first email contained a number of misspellings and was nearly incoherent. It indicated that he was in Cranberry, it was his first day at the store, he and his fiancée had recently moved, the store alarm was going off and he did not know how to stop it, he had tried to fire two employees but was not permitted to do so, and he was "very scared." He sent additional emails to the same recipients at 8:32 a.m. and 10:36 a.m. indicating that his fiancée was taking

him to the hospital and that he was at the Children's Hospital. At 12:27 p.m., Edger texted Yarberry, noting that they had previously spoken and that he needed Yarberry to take a drug test that day. Yarberry replied, "No."

By this point, Yarberry's behavior had come to the attention of several other Hhgregg officials. Cynthia Bush, Hhgregg's Associate Relations Manager and the person who ultimately terminated Yarberry, was forwarded the emails Yarberry sent to Edger and the five senior officials, and had ongoing conversations with Edger regarding his contact with Yarberry and his then-fiancée, Whitney Yarberry ("Whitney"). Bush wrote several notes regarding these phone calls on her printed copies of the emails. In notes dated August 2, Bush indicated that she had spoken to Zimmerman, who was investigating Yarberry, and that she had spoken with Charlie Young, Hhgregg's Officer of Human Resources, who indicated that "based on the guy's behavior he [should be] fired. He was in the st[ore] as well." Bush advised that they wait for the results of Zimmerman's report, while noting that Yarberry had not armed the building when he left although he did lock it.

Zimmerman called Yarberry at some point during the day as part of his investigation. During the course of their conversation, Zimmerman found it nearly impossible to have a conversation with Yarberry, who kept talking rapidly and incessantly. Yarberry's comments included statements such as the following: "I can't ever get a hold of [Edger] and I bought a newspaper to figure him out, how I might be able to corner the market on the best sales strategy while blowing [Edger] away with my awareness for details." Zimmerman eventually told Yarberry that he was suspending his employment pending investigation, that the notes from their conversation would be sent to Human Resources, and he would be contacted.

At 3:04 p.m., Whitney, who had come to Pittsburgh to help Yarberry get medical care, called Edger and told him that she was taking Yarberry to a hospital and that he would do a drug test. At 3:47 p.m., Yarberry texted Edger that he had taken the test and was "taking a mental health day." A lab report dated August 2, 2011 at 2:50 p.m.[1] verified that Yarberry had tested negative for drugs. Yarberry was taken to a hospital by late afternoon, and he was admitted to a psychiatric hospital on August 3.

**3. Wednesday, August 3**:

Zimmerman submitted his report to Bush and other Hhgregg officials on Wednesday, August 3 at 12:22 p.m., attaching the negative drug test results and summarizing the text messages and emails sent to Hhgregg officials, the surveillance footage, and his phone conversation with Yarberry. Several of the emails were attached to the report. Zimmerman concluded that Yarberry "demonstrated that he does not use his access to the building responsibly and also did not cooperate with my investigation. I could not get any question answered. He just kept talking." The report also indicated that Yarberry had not stolen anything.

Bush reviewed Zimmerman's report and at 1:03 p.m. initially informed Edger through email that she had decided to terminate Yarberry. However, Bush retained a printed copy of the email that she continued to write notes on, altering the language of the proposed termination letter. On the top of the email she wrote "8/3 RM [Edger] phoned[,] rec[eived] message from fiancée that mgr [Yarberry] [check]ed [him]self in hospital."

Whitney stated that she called Edger at 1:49 p.m. and left him a message informing him that Yarberry had been committed to a psychiatric hospital. At 2:09, Whitney called Craig

---

[1]The time is likely central time, as the "Medical Review Officer" was located in Kansas.

Uckman, a Hhgregg District Manager to whom Yarberry reported, and asked about Yarberry's employment status. Uckman directed her to Edger. Edger called Whitney back at 4:20 p.m. and she again told Edger that Yarberry had been admitted to a psychiatric hospital and asked about his employment status. Edger did not mention Yarberry's termination.

Bush consulted with legal counsel, Stuart Buttrick, after learning of Yarberry's hospitalization. She told Buttrick that Yarberry had been involuntarily committed to a mental hospital. She also informed Young and described both as involved in the termination decision. Bush admitted that she had knowledge of Yarberry's hospitalization while making her termination decision. She asserted, however, that the reason for termination was Yarberry's "inappropriate behavior for being in the store in the middle of the night, disarming the store, being in the safe, playing on the computer, sleeping on the mattress." Bush denied considering if there might be a medical explanation for Yarberry's behavior. Her notes from her conversations on the afternoon of August 3 read that she "[talked to] Stuart[,] proceed w[ith] term," and "advised [to] proceed w[ith] term but HR will send revised verb[i]age."

Hhgregg's "Drug-Free/Alcohol-Free Workplace Policy" permits employees who have a positive drug test to undergo a treatment program at their own expense and provides that they may eventually be allowed to return to work. The policy also provides that employees in violation of the policy "will be subject to disciplinary action, up to and including immediate termination of employment." According to Bush, the drug and alcohol policy was distinct from and did not supersede Hhgregg's Associate Conduct Policy, which provides that "employment may be terminated at will by … Hhgregg with or without cause and without following any system of discipline or warning," for grounds including failure to cooperate, safety, the unauthorized use of employer time/property, as well as other policies, procedures and practices.

Zimmerman testified that employees accessing the stores outside normal hours could only do so for legitimate business purposes and that this policy was safety-driven. He also assumed Yarberry would be terminated because of his refusal to cooperate with the investigation, which in itself constituted a violation of Hhgregg policy.

At some point on the afternoon of August 3, Bush told Edger to call Yarberry and inform him of his termination, but Edger could not get through to Yarberry. Bush then sent Edger another draft of the termination letter at 4:52 p.m. and told him to send it to Yarberry. Edger did not send the letter at that time, however. At 5:00 p.m. and again at 11:00 p.m., Yarberry sent long, disjointed emails to senior Hhgregg officials, apologizing for his behavior, expressing his fear of Vozza and Edgar, explaining that he went to the store "to make sure Adam closed it correctly," asking if he could keep his job, and informing them that he was at the Western Psychiatric Institute and Clinic.

### 4. **Thursday, August 4**

At 7:39 a.m., Yarberry's emails of the previous evening were forwarded to Bush. Bush once again consulted with legal counsel and Young regarding these new emails and later admitted that she could have reconsidered her termination decision. At some point on August 4, at Bush's direction, Edger sent the termination letter. The letter, signed by Edger and apparently sent overnight,[2] reads as follows:

> Investigation reveals your conduct was inappropriate, you disarmed the store at 2:15 a.m. locking yourself in the building, entering the safe and playing on computers on the sales floor for a couple of hours. In addition, you failed to cooperate in the investigation. Your behavior violates the company's detrimental behavior, failure to cooperate, safety and other policies, procedure and practices and you demonstrated a lack of professional judgment expected by hhgregg management. Therefore, effective immediately your employment is terminated.

---

[2]Days later, Edger indicated to Bush that "the letter was mailed overnight to the address [Bush] provided on 8/4 however it is safe to assume no one has received or opened that letter yet."(R. 36-1, Ex. 35, PageID 524)

(R. 36-1, Ex. 30, PageID 513)  The letter was sent to Yarberry's home address, but no one from Hhgregg attempted to contact Yarberry or Whitney.

### 5. After August 4

On August 8, Yarberry's father, Don Yarberry ("Don"), emailed several Hhgregg officials, again informing them that his son was hospitalized.  Bush called Don on August 9th and informed him that Yarberry had been terminated for violating company policy.  He said he would pass the information on to Yarberry and asked where the termination letter had been sent.

In a letter dated August 11, Dr. Michael Marcsisin wrote to Bush, informing her that Yarberry was hospitalized at the Western Psychiatric Institute and Clinic for "medical treatment of a manic episode, which started in mid-July."  He described this manic episode as resulting from Bipolar I Disorder, a medical illness that can lead to erratic and apparently irrational behaviors.  Dr. Marcsisin concluded that Yarberry's manic episode "likely led to his unusual behaviors prior to hospitalization".  He stated that Yarberry was responding well to treatment but would need continuing outpatient treatment and should not return to work before August 29.

On August 16, Yarberry called Bush and asked if she had received the letter from his doctor.  Bush told him he was terminated, but Yarberry asked to be reinstated anyway.  Bush called Young, who told her not to reinstate Yarberry, and also consulted with legal counsel.  On August 17, Bush spoke to Yarberry again and told him that the termination decision stood.

After returning to Cincinnati from Pittsburgh, Yarberry soon began to work for a former employer, Play It Again Sports, albeit at a lower salary than he had earned at Hhgregg.  Yarberry refilled the prescriptions that Dr. Marcsisin had given him once, but stopped taking his medications after two months.  At some point in 2012, Yarberry met for one hour each with a

doctor and social worker and after these single meetings each opined that he had an adjustment reaction rather than bipolar disorder. Dr. Brown said he would not write down a diagnosis of bipolar on Yarberry's file because it could affect his employment. Yarberry testified that he believed Dr. Marcsisin's diagnosis, however, because he was under his care for several days, and never returned to see Dr. Brown.

## B. **Procedural History**

Yarberry filed suit against Hhgregg on August 10, 2012, claiming violations of the Americans with Disabilities Act ("ADA"), pursuant to 42 U.S.C. § 12112. Yarberry moved for partial summary judgment regarding Hhgregg's violations of the ADA, and Hhgregg moved for summary judgment. The Magistrate Judge issued a Report and Recommendation, recommending the grant of summary judgment to Hhgregg. Yarberry filed objections to the Report. The district court overruled Yarberry's objections, adopted the Magistrate Judge's Report and Recommendation, and granted summary judgment to Hhgregg, denying Yarberry's motion for summary judgment. Yarberry timely appealed to this court.

## II. ANALYSIS

We review a district court's grant of summary judgment de novo. *Kroll v. White Lake Ambulance Auth.*, 763 F.3d 619, 623 (6th Cir. 2014). Summary judgment is appropriate when the moving party has shown that there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "An issue of fact is genuine if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Sjöstrand v. Ohio St. Univ.*, 750 F.3d 596, 599 (6th Cir. 2014) (internal quotation marks omitted). "On a motion for summary judgment, the court must view all evidence and draw any

reasonable inferences therefrom in favor of the nonmoving party." *Kroll*, 763 F.3d at 623 (citing

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

The Americans with Disabilities Act provides that "[n]o covered entity shall discriminate

against a qualified individual on the basis of a disability in regard to job application procedures,

the hiring, advancement, or discharge of employees, employee compensation, job training, and

other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). Claims brought

under the ADA are evaluated under the *McDonnell-Douglas* burden-shifting regime. *See*

*Monette v. Elec. Data Sys. Corp.*, 90 F.3d 1173, 1178-85 (6th Cir. 1996) (abrogated on *other*

grounds by *Lewis v. Humboldt Acquisition Corp., Inc.*, 681 F.3d 312 (6th Cir. 2012) (en banc)).

First, a plaintiff must establish a prima facie case of discrimination, showing that 1) he is

disabled; 2) he was otherwise qualified for the position, with or without reasonable

accommodation; 3) he suffered an adverse action; 4) the employer knew or had reason to know

of his disability; and 5) he was replaced or the job remained open. *Rosebrough v. Buckeye*

*Valley High Sch.*, 690 F.3d 427, 431 (6th Cir. 2012); *Monette*, 90 F.3d at 1185.[3] If the plaintiff

can establish a prima facie case, the burden shifts to the defendant to provide a "legitimate,

nondiscriminatory reason" for his adverse action. *Monette*, 90 F.3d at 1185 (quoting *St. Mary's*

*Honor Ctr. v. Hicks*, 590 U.S. 502, 506-07 (1993)). Then the plaintiff must present evidence that

would allow a jury to find that the defendant's explanation is a pretext for unlawful

discrimination. *Id.* at 1186. The plaintiff must show that he was terminated "on the basis of

---

[3]Yarberry does not appear to dispute the district court's finding that his case is one of indirect evidence of disability discrimination. Although he invokes the direct evidence theory in his argument that Hhgregg failed to offer a reasonable accommodation, he appears to make this argument in the alternative and does not dispute the application of the indirect evidence framework in prior sections of his brief. As the district court noted, precisely because Yarberry asks us to infer that Hhgregg terminated him because of his bipolar disorder, based upon his prior behavior, this is not a case of direct evidence of discrimination. *See Chandler v. Specialty Tires of Am. (Tenn.). Inc.*, 134 F. App'x 921, 927 (6th Cir. 2005) (finding that the facts required an inference to establish that employer terminated employee because of her perceived depression); *Monette*, 90 F.3d at 1184-85.

disability," 42 U.S.C. § 12112(a), meaning that the plaintiff must show his disability was the "but-for" cause for his termination. *Lewis*, 681 F.3d at 321.

The district court found that Yarberry failed to establish the fourth step in the prima facie case because he could not show that Hhgregg knew or had reason to know of his disability as Bush was not specifically aware that Yarberry had been diagnosed with a bipolar disorder at the time she decided to terminate him. The district court then found that, even assuming Yarberry could make a prima facie case, Hhgregg had articulated legitimate, non-discriminatory reasons for the discharge—Yarberry's after-hours misconduct in the store, multiple violations of store policy and his refusal to cooperate with Zimmerman's investigation. The district court also rejected Yarberry's contention that Hhgregg's "drug and alcohol" policy provided more favorable treatment to "non-disabled" employees. Finally, the court rejected Yarberry's claim that Hhgregg failed to provide him with reasonable accommodations for his disability, finding that even if he had requested any accommodation he did not do so in a timely manner before his termination, and that an employer is not required to excuse disability-related misconduct. Yarberry now appeals these rulings.

### A. Hhgregg's Knowledge of Yarberry's Disability

The parties dispute whether Yarberry has established the fourth element in the prima facie case, showing that Hhgregg "knew or had reason to know of [his] disability." *Rosebrough,* 690 F.3d at 431. Yarberry argues both that Hhgregg had reason to know that Yarberry was suffering from a disability when Bush made the decision to terminate him on August 3 at 1:03 p.m. and that Bush's initial decision was not final until August 4, by which time she knew that Yarberry had been committed to a psychiatric hospital. Hhgregg argues that the district court correctly determined that Hhgregg did not know or have reason to know of Yarberry's disability

and that the time of termination was 1:03 p.m. on August 3. We find that Yarberry has established a prima facie case, as Hhgregg did have reason to know that Yarberry was suffering from a disability at the time it terminated his employment.

### 1. Time of Termination

To establish the date of termination, the Sixth Circuit looks at the initial date on which a decision maker with the authority to do so decided to terminate an employee. In *Burns v. City of Columbus*, 91 F.3d 836 (6th Cir. 1996), a Board reviewed a police officer's performance and recommended termination in May 1992, and he was officially terminated by the City on July 1— after he had notified his employer of his medical condition. The court found that the May termination by the Board could not have been predicated on his disability. *Id.* at 844. Similarly, when an employer initiated termination proceedings on November 20, the employee informed him of her pregnancy on November 24, and the employee was officially discharged on November 26, this court found that the employee failed to establish that the employer had actual knowledge of her pregnancy at the time of termination. *Prebilich-Holland v. Gaylord Entertainment Co.*, 297 F.3d 438, 444 (6th Cir. 2002).

Reviewing the facts in the light most favorable to Yarberry, we find that Bush made her final decision to terminate Yarberry at some point in the late afternoon of August 3. Although Bush had told Edger of her decision to terminate Yarberry at 1:03 p.m. via email, she appears to have rescinded that decision after learning that he had been committed to a psychiatric hospital, consulting with Buttrick as well as Young, and informing both of Yarberry's commitment. She testified that both Buttrick and Young were involved with the termination decision, which implies that it was an ongoing process over the course of the afternoon. Bush's notes indicated that she only later decided to "proceed w[ith] term[ination]," the phrase indicating that she did

not regard her initial decision as final and indeed had temporarily halted it. The fact that Edger, who was in constant communication with Bush that day, did not tell Whitney that Yarberry had been terminated when she explicitly asked him during their 4:20 p.m. phone call indicates that Edger, too, did not consider his earlier instructions from Bush to still be in effect. Bush's 4:52 p.m. email to Edger, attaching a final draft of the termination letter, is the appropriate time of termination.

### 2. Hhgregg's Likely Knowledge of Yarberry's Disability

Yarberry and Hhgregg dispute whether Hhgregg was on notice of Yarberry's disability under the foregoing circumstances. Under the burden-shifting analysis, generally, "[a]n employer has notice of the employee's disability when the employee tells the employer that he is disabled." *Hammon v. DHL Airways, Inc.*, 165 F.3d 441, 450 (6th Cir. 1999). In discussing an analogous claim under the Rehabilitation Act, we required that the plaintiff establish "that the defendant knew or believed that the plaintiff was disabled, or knew of the plaintiff's symptoms that were caused by the disability." *Burns*, 91 F.3d at 844. As we reasoned in *Burns*, this inquiry is crucial because "unless the [employer] knew or believed that the plaintiff was disabled, or knew that the symptoms were caused by a disability as defined by law, it would be impossible for the [employer] to have made its decision *because of* the disability." *Id*. It is also reasonable to conclude, however, that an employer is on notice of a disability if an employee's symptoms are "severe enough to alert" it, giving it either knowledge or "some generalized notion" of the disability. *Nilles v. Givaudan Flavors Corp.*, 521 F.App'x 364, 369 (6th Cir. 2013); *see also Hedberg v. Ind. Bell Tel. Co., Inc.*, 47 F.3d 928, 934 (7th Cir. 1995) ("it may be that some symptoms are so obviously manifestations of an underlying disability that it would be reasonable to infer that an employer actually knew of the disability.").

The onset of mental illness—especially the sudden onset of such illness—presents distinct fact patterns regarding sufficiency of notice under the ADA, as the illness itself may prevent the individual from directly communicating his disability to his employer. While the Sixth Circuit has no case exactly on point, the Third Circuit addressed such a scenario in *Taylor v. Phoenixville School District*, 184 F.3d 296 (3d Cir. 1999), in which a plaintiff suddenly "became psychotic at work," "the school district knew she was hospitalized immediately thereafter," and the hospital "contacted the school district by letter about [the plaintiff's] hospitalization and provided a phone number to answer questions." *Id.* at 313-14. The school district was in contact with the plaintiff's doctors and requested a note from the psychiatrist treating her conditions. *Id.* at 314. "Based on this evidence," the court concluded, "the school district had more than enough information to put it on notice that Taylor might have a disability," triggering its obligation to participate in the interactive process so as to reasonably accommodate her. *Id.* The court also noted that it was "not essential that [school officials] knew the specific name of Taylor's condition," given its knowledge of her hospitalization for three weeks and subsequent treatment." *Id.*

Where employers have no notice of a mental illness or the few symptoms that are evident could be due to alternative causes, courts have found employers not to be on notice of a disability. The Third Circuit distinguished its *Phoenixille* case from *Taylor v. Principal Financial Group, Inc.*, 93 F.3d 155, 159 (5th Cir. 1996), in which an employee with worsening job performance told his employer that he was bipolar but said he was all right; he never offered more information about his disorder or offered confirmation of the diagnosis from a doctor. There, the Fifth Circuit found insufficient notice to trigger the employer's duty to engage in the interactive process entailed under the ADA. *Id.* at 164-65. Likewise, in *Crandall v. Paralyzed*

*Veterans of America*, 146 F.3d 894, 896-97 (D.C. Cir. 1998), a Rehabilitation Act case, the D. C. Circuit found there to be no "adequate, prior alert to the defendant of the plaintiff's disabled status" where the plaintiff displayed extremely "rude behavior" but did not reveal to his employer that he suffered from bipolar disorder. *Id.* at 898. The court clarified that a plaintiff must show "the employer must have acted with an awareness of the disability itself, and not merely an awareness of some deficiency in the employee's performance that might be a product of an unknown disability." *Id.* at 897 (citing cases).

Here, when Bush made her termination decision, she knew that Yarberry's fiancée believed he needed to be hospitalized and that Yarberry: had engaged in strange behavior at a store and sent text messages and emails evidencing illogical and irrational thinking; could not carry on a rational conversation; had passed a drug test; and was subsequently placed in a psychiatric hospital. These facts, viewed in the light most favorable to Yarberry, show that Hhgregg had reason to know that Yarberry was suffering from a mental illness rather than the effects of alcohol or drugs and that his prior, sudden, and bizarre behavior was attributable to that illness. Although the timeline is more compressed than in *Taylor* v. *Phoenixville School District*, here, too, there was a sudden onset of symptoms and a fairly quick hospitalization, followed by termination. Precisely because Yarberry's termination was finalized after Bush knew of Yarberry's involuntary commitment to a mental hospital, that knowledge combined with the sudden onset of his extreme symptoms is sufficient for us to conclude that Hhgregg had constructive notice of a serious mental illness and that the district court erred in determining otherwise. We therefore hold that Yarberry can establish his prima facie case of discrimination under the ADA.

B. **Hhgregg's Reasons for Termination**

Once the prima facie case is shown, Hhgregg must establish that it had a legitimate, nondiscriminatory reason for terminating Yarberry. Yarberry then must present evidence that would allow the jury to find that Hhgregg's explanation is a pretext for unlawful discrimination. *Monette*, 90 F.3d at 1185-86. Yarberry argues that his termination for behavior directly stemming from his bipolar disorder violated the ADA, and that Hhgregg's policy permitting employees who test positive for drugs or alcohol to return to work after treatment shows that Hhgregg's reasons for dismissing Yarberry are pretextual. Hhgregg argues that the Sixth Circuit permits employers to fire employees for conduct that is the result of a disability, and that its reasons for terminating Yarberry were nondiscriminatory. In light of the Equal Employment Opportunity Commission's ("E.E.O.C") own Guidance to the ADA as well as Sixth Circuit precedent, Yarberry's argument fails.

1. **Workplace Misconduct Resulting from a Disability**

The E.E.O.C. 2008 Guidance to the ADA provides that an employer may only discipline an employee for disability-related conduct if "the conduct rule is job-related and consistent with business necessity and other employees are held to the same standard." The Americans with Disabilities Act: Applying Performance and Conduct Standards to Employees with Disabilities, 2008 WL 4786697, at *9. Such Enforcement Guidance is "'very persuasive authority' in questions of statutory interpretation of the ADA." *Kroll,* 691 F.3d at 815 (quoting *Lee v. City of Columbus*, 636 F.3d 245, 256 (6th Cir. 2011)). The guidance states that "[t]he ADA does not protect employees from the consequences of violating conduct requirements even where the conduct is caused by the disability." 2008 WL 4786697, at *9. Employers not only have latitude to discipline employees for "threats of violence, stealing, or destruction of property," but also

may "prohibit inappropriate behavior between co-workers," "prohibit employees from sending inappropriate or offensive emails . . . and making excessive use of the employer's computers and other equipment for purposes unrelated to work," "require that employees observe safety and operational rules enacted to protect workers from dangers inherent in certain workplaces," and "prohibit drinking or illegal use of drugs in the workplace." *Id.* at *9-10. An employer may enforce any conduct rules, even those not found in workplace policies, employee handbooks or other such documents, as long as those policies are job-related and consistent with a business necessity. *Id.* at *13. Where disruptive rather than violent behavior is involved, however, "[w]hether an employer's application of a conduct rule to an employee with a disability is job-related and consistent with business necessity may rest on several factors, including the manifestation or symptom of a disability affecting an employee's conduct, the frequency of occurrences, the nature of the job, the specific conduct at issue, and the working environment." *Id.* at *10.

Our precedent states that "an employer may legitimately fire an employee for conduct, even conduct that occurs as a result of a disability, if that conduct disqualifies the employee from his or her job." *Macy v. Hopkins Cnty. Sch. Bd. of Educ.*, 484 F.3d 357, 366 (6th Cir 2007) (abrogated on other grounds by *Lewis v. Humboldt Acquisition Corp., Inc.*, 681 F.3d 312 (6th Cir. 2012)). "Employers subject to the . . . ADA must be permitted to take appropriate action with respect to an employee on account of egregious or criminal conduct, regardless of whether the employee is disabled." *Maddox v. Univ. of Tenn.*, 62 F.3d 843, 848 (6th Cir. 1995) (abrogated on other grounds by *Lewis v. Humboldt Acquisition Corp., Inc.*, 681 F.3d 312). In *Brohm v. JH Properties, Inc.*, 149 F.3d 517 (6th Cir. 1998), this court found that where an anesthesiologist fell asleep while administering anesthesia, later citing sleep deprivation resulting

from sleep apnea as a possible reason, the hospital had a legitimate reason for terminating him because "it is unsafe to employ an anesthesiologist who sleeps while performing his duties." *Id.* at 522. However, an employer may violate the ADA if he cites employee behavior caused by mental illness that occurs outside the workplace as grounds for employer discipline. See *Chandler*, 134 F. App'x at 929 (holding that the district court erred in distinguishing between the employee's conduct—a suicide attempt—and the possibility that her employer perceived her to have a disability).

Yarberry cites a number of cases from other circuits—primarily the Tenth and Ninth—for the proposition that abnormal conduct stemming from mental disabilities can be considered part of the disability. In *Den Hartog v. Wasatch Academy*, 129 F.3d 1076 (10th Cir. 1997), the Tenth Circuit confirmed that violent, threatening, or safety-related behavior resulting from a disability need not be tolerated by employers. *See* 42 U.S.C. § 12113(a), (b). Yet, the *Den Hartog* court also reasoned that the availability of defenses under the ADA such as "undue hardship" or a "direct threat" to health or safety of other employees "establishes that there are certain levels of disability-caused misconduct that have to be tolerated or accommodated." *Id.* at 1087. Because "mental illness is manifested by abnormal behavior," the court observed that, "[t]o permit employers carte blanche to terminate employees with mental disabilities on the basis of any abnormal behavior would largely nullify the ADA's protection of the mentally disabled." *Den Hartog*, 129 F.3d at 1087. In *Chandler*, our court cited *Den Hartog* approvingly for this proposition, emphasizing that "[a]n employer should 'tolerate eccentric or unusual conduct caused by the employee's mental disability, so long as the employee can satisfactorily perform the essential functions of his job.'" *Chandler*, 134 F. App'x at 929 (quoting *Den Hartog*, 129 F.3d at 1088).

The Ninth Circuit has extended the reasoning of *Den Hartog* in a series of cases, observing that "for purposes of the ADA . . . conduct resulting from a disability is considered to be part of the disability, rather than a separate basis for termination." *Humphrey v. Mem. Hosp. Ass'n.*, 239 F.3d 1128, 1139-40 (9th Cir. 2001). *See also Gambini v. Total Renal Care, Inc.*, 486 F.3d 1087, 1095 (9th Cir. 2007) (determining that an employee with bipolar disorder was entitled to jury instruction "that if it found that her conduct at issue was caused by or was part of her disability, it could then find that one of the 'substantial reasons' she was fired was her bipolar disorder."); *Dark v. Curry Cnty.*, 451 F.3d 1078, 1084 (9th Cir. 2006) (determining a genuine issue of fact existed regarding whether an epileptic employee who had a seizure while driving had been terminated due to his disability).

E.E.O.C. 2008 Guidance and Sixth Circuit case law suggest that where there has been employee misconduct—including nonviolent disruptive misconduct—the employer may terminate the employee for that behavior, even if it is related to his disability. The E.E.O.C. Guidance suggests looking to factors including: "the manifestation or symptom of a disability affecting an employee's conduct," "the frequency of occurrences," "the nature of the job," "the specific conduct at issue," "and the working environment." 2008 WL 4786697 at *10. Yarberry's is a close case: the manic episode apparently associated with his bipolar disorder that caused him to enter a Hhgregg store after hours was non-violent and occurred only once. Hhgregg's decision to terminate a previously successful employee so quickly after such an isolated event is concerning. Even so, Yarberry's behavior in entering a store after hours, opening the safe, roaming around the store and using store equipment, and then leaving the store without setting the alarm, all gave Hhgregg grounds for terminating him for his conduct alone, which violated company policies regarding safety and security as well as general behavior

standards for management. In light of these specific facts, Hhgregg had legitimate, nondiscriminatory reasons for the termination.

### 2. **Pretext**

Yarberry next argues that his termination by Hhgregg on the basis of his conduct was a pretext for discriminatory behavior, and points to Hhgregg's Drug-Free/Alcohol-Free Workplace Policy. The policy provides that employees who have violated the drug and alcohol policy may be given a chance to obtain treatment and return to work if successfully treated. Hhgregg argues that it could make its termination decision once it had confirmed Yarberry's misconduct, and that there is no evidence that an employee who used drugs or alcohol and committed the same misconduct would not also be terminated.

In order to establish pretext, a plaintiff will usually need to show "that the employer's stated reason for the adverse employment action either (1) has no basis in fact, (2) was not the actual reason, or (3) is insufficient to explain the employer's action." *Risch v. Royal Oak Police Dept.*, 581 F.3d 383, 391 (6th Cir. 2009) (internal quotation marks omitted). A plaintiff "may also demonstrate pretext by offering evidence which challenges the reasonableness of the employer's decision to the extent that such an inquiry sheds light on whether the employer's proffered reason for the employment action was its actual motivation." *Id.* (internal quotation marks omitted).

Yarberry's argument is not sufficiently compelling. Although Hhgregg does have a policy regarding employees who fail a drug or alcohol test, Yarberry has offered no evidence that such an employee who also committed misconduct akin to Yarberry's—improperly accessing store property and equipment and then failing to cooperate with the investigation—would be treated any differently than Yarberry. While the drug and alcohol policy does offer employees

who test positive a chance to seek treatment and be reinstated, the policy also states that its violation may be grounds for termination, and Bush testified that the Associate Conduct Policy constitutes separate grounds for termination. Under the Associate Conduct Policy, "employment may be terminated at will by … Hhgregg with or without cause and without following any system of discipline or warning," on grounds including "detrimental behavior," "safety," and "unauthorized use of employer time/property." *See Landefeld v. Marion Gen. Hosp., Inc.*, 994 F.2d 1178, 1181-82 (6th Cir. 1993) (holding that where a plaintiff later diagnosed with bipolar disorder had been caught stealing mail from other employees and was fired for the theft, he could not prove that he had been discharged solely because of his mental illness). In light of the Conduct Policy and because he presents no evidence showing that employees with drug or alcohol problems who committed similar offenses were treated differently, Yarberry has not carried his burden of establishing pretext.

## C. **The Obligation to Provide Reasonable Accommodation**

Yarberry argues, in the alternative, that there is direct evidence that Hhgregg failed to reasonably accommodate his disability, while Hhgregg argues that the district court was correct in determining that it had no duty to accommodate Yarberry. Under the ADA, an employer must make "reasonable accommodations to known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee" unless it can prove that such an accommodation would impose an "undue hardship" on the business. 42 U.S.C. § 12112(b)(5)(A). Were Yarberry able to establish his claim that there is direct evidence Hhgregg relied on his disability in terminating him, he would then need to establish a prima facie case by showing that he is disabled and "otherwise qualified for the position despite his or her disability: (a) without accommodation from the employer; (b) with an alleged essential job requirement

eliminated; or (c) with a proposed reasonable accommodation." *Kleiber v. Honda of Am. Mfg., Inc.*, 485 F.3d 862, 869 (6th Cir. 2007) (internal quotation marks omitted). Then the employer "will bear the burden of proving that a challenged job criterion is essential, and therefore a business necessity, or that a proposed accommodation will impose an undue hardship upon the employer." *Id.* (internal quotation marks omitted). Yarberry argues that there is ample evidence that he was qualified and that his proposed accommodation—a leave of absence to seek treatment—did not impose an undue hardship on Hhgregg. Hhgregg counters that Yarberry could not rely on his disability and request an accommodation after engaging in terminable misconduct.

The E.E.O.C. Guidance supports Hhgregg's position. The Guidance specifies that "[i]f an employee states that her disability is the cause of the conduct problem or requests accommodation, the employer may still discipline the employee for the misconduct." 2008 WL 4786697, at *12. "If the appropriate disciplinary action is termination, the ADA would not require further discussion about the employee's disability or request for reasonable accommodation." *Id.* The timing of a request is crucial, as "an employer does not have to rescind discipline (including termination) warranted by misconduct." *Id.* at *13. Had Yarberry not already engaged in misconduct meriting termination, it is possible that his requests for time off due to his hospitalization might have been timely and Hhgregg would have been obliged to try to accommodate him. However, because Yarberry had already committed the misconduct that Hhgregg cited as the reason for his termination, Hhgregg was not obligated to rescind Yarberry's termination or engage in further discussion of his requests for accommodation.

## III. <u>CONCLUSION</u>

Although Hhgregg was on constructive notice of Yarberry's disability at the time of his termination—enabling Yarberry to establish his prima facie case of discrimination under the ADA—Hhgregg carried its burden of showing that its conduct-based reasons for termination were nondiscriminatory. Yarberry could not show that those reasons were pretextual and so his discrimination claim fails. Yarberry's reasonable accommodation claim also fails, as Hhgregg was not under an obligation to accommodate him after terminating him for misconduct. For the forgoing reasons, we AFFIRM the district court's grant of summary judgment to Hhgregg.