RENDERED: APRIL 21, 2023; 10:00 A.M.
NOT TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2022-CA-0812-MR

GRAVITY DIAGNOSTICS, LLC                                    APPELLANT

v.
APPEAL FROM KENTON CIRCUIT COURT
HONORABLE PATRICIA M. SUMME, JUDGE
ACTION NO. 19-CI-01631

KEVIN BERLING                                                    APPELLEE

OPINION
AFFIRMING

** ** ** ** **

BEFORE: THOMPSON, CHIEF JUDGE; COMBS AND JONES, JUDGES.

COMBS, JUDGE: Appellant, Gravity Diagnostics, LLC (Gravity), appeals from a

judgment on a jury verdict in favor of Appellee, Kevin Berling (Berling), whose

employment was terminated after he suffered panic attacks at work. Gravity

argues that Berling does not meet the statutory definition of "disability" under the

Kentucky Civil Rights Act (KCRA), Kentucky Revised Statutes (KRS)

344.040(1). Gravity also argues that the trial court should have conducted a

hearing to investigate alleged post-verdict juror misconduct. Gravity requests that we reverse the judgment and direct the trial court to enter judgment notwithstanding the verdict (JNOV) in its favor; alternatively, it asks that we reverse the judgment and remand for the trial court to hold a hearing to determine whether juror misconduct occurred. After our review, we affirm.

In 2009, Berling was diagnosed with a generalized anxiety disorder and panic attacks. For approximately six years, he has treated weekly with his current therapist, Sarah Garvin, who testified at the trial. Berling described a panic attack as feeling as if the world is closing in on him, being terrified, and wanting to run away and hide.

In October 2018, Berling was hired by Gravity, a laboratory testing company, as an accessioner, a position which involves organizing test samples and entering data. Before Gravity became aware of Berling's mental health issues in August 2019, he received positive performance reviews and a raise, and he was being cross-trained to work in the lab processing samples in addition to his work as an accessioner.

Gravity customarily celebrated its employees' birthdays by purchasing a cake and a card for everyone to sign and hanging a banner in the breakroom. Berling's birthday -- which falls on August 7 -- was a trigger for his panic attacks. In anticipation of that event, Berling and his therapist decided that

Berling should discuss the matter with Allison Wimmers, Gravity's Chief of Staff. Prior to that point, Berling had not told anyone at Gravity that he had a panic disorder or any kind of mental disorder.

Berling spoke with Allison Wimmers the week before his birthday. Berling testified at trial that he told Wimmers that his birthday can cause a lot of stress and anxiety, that it could lead to a panic attack, and that he would prefer that nothing happen on his birthday. Wimmers agreed to honor Berling's request. Unfortunately, she forgot about it and was out of town on business the following week. Consequently, the staff prepared the usual birthday celebration for Berling on August 7, 2019, which he discovered upon entering the breakroom at lunchtime. Berling grabbed his lunch and went out to his car where he suffered a panic attack. After his lunch break, Berling went back into work and kept to himself.

The next morning, Thursday, August 8, 2019, Berling was called into a meeting with Amy Blackburn, lead accessioner and his immediate supervisor, and Ted Knauf, another Gravity employee, regarding what had occurred the day before. According to Berling's testimony at trial, Blackburn started yelling at him, telling him that he was "stealing people's joy" and "that he needed to suck it up and get over it." That verbal diatribe triggered another panic attack, which he described as crying, hyperventilating, and saying "please stop, panic attack, not now" -- a technique he has been taught to use to communicate what is happening.

Blackburn and Knauf left the room. After a couple of minutes, Berling was able to walk out of the conference room. Blackburn and Knauf were waiting for him; they told him to go home and to come back on Monday. They asked for his key fob.

As Gravity notes in its Brief, the testimony of Blackburn and Knauf provided a different account of that meeting. According to Blackburn, they were trying to see what was going on. Berling related that he had had a panic attack the previous day because of the birthday celebration and that he "felt like he was being suffocated." Blackburn denied telling Berling that he was stealing other people's joy; he also denied making other antagonistic remarks as Berling had testified. According to Blackburn, Berling's behavior in the meeting was "concerning"; *i.e.*, he got red, started clenching his fists, and closed his eyes. Blackburn asked if he was okay. Berling just kept saying, "silence, please do not talk." According to Blackburn, Berling opened his eyes at one point and looked at her with a cold stare that scared her. Blackburn and Knauf walked past Berling and stepped out of the conference room. After Berling came out, they escorted him from the building without incident.

Knauf testified that Blackburn handled the situation professionally. Berling had a visceral reaction displaying clenched fists (inward), rocking, heavy breathing, and redness in the face. Knauf thought that something crazy was going

to happen.  Berling said "silence, silence," on multiple occasions.  Knauf was in fear and thought that they needed to get Berling out of the building.

At 12:02 p.m. that afternoon, Berling sent Blackburn a text message stating that he was sorry he "had a panic attack at work yesterday and today." Blackburn testified that she provided a copy of Berling's message to Julie Brazil, Gravity's Chief Operating Officer.

Later in the afternoon of August 8, 2019, Brazil, Blackburn, Knauf, and Wimmers had a telephone conference.  Brazil testified that it was her decision to terminate Berling.  She terminated him for his actions on August 8 that had made Blackburn and Knauf feel physically unsafe in the workplace.  Gravity's employee handbook has a zero-tolerance policy for employees who engage in violent or threatening behavior.

On Sunday, August 11, 2019, Brazil sent Berling a letter by email notifying him that his employment was being terminated because his behavior had caused some of his coworkers to "feel threatened and unsafe."

On September 10, 2019, Berling filed a complaint against Gravity in Kenton Circuit Court asserting various claims in violation of the Kentucky Civil Rights Act, KRS Chapter 344.  Gravity subsequently filed a motion for summary judgment, which the trial court denied by order entered on October 21, 2021.  The case proceeded to trial before a jury on March 30-31, 2022.  At trial, Berling

voluntarily dismissed his claims for failure to accommodate and retaliation, pursuing only the claim for disability discrimination, which was presented to the jury after the trial court denied Gravity's motions for directed verdict. The jury returned a unanimous verdict for Berling awarding $150,000.00 in lost wages and $300,000.00 in damages for emotional distress.

Gravity filed a motion for judgment notwithstanding the verdict (JNOV). Gravity also filed a motion for a new trial based upon newly discovered evidence, contending that after the trial ended, it discovered that a juror had viewed Brazil's LinkedIn page. The trial court denied both motions by orders entered on June 17, 2022, which we address more fully in our analysis below.

Gravity has appealed. As this Court explained in *Insight Kentucky Partners II, L.P. v. Preferred Automotive Services, Inc.*, 514 S.W.3d 537, 545–46 (Ky. App. 2016):

> The standard of review regarding a motion for a directed verdict or JNOV has been described as a difficult one for an appellant to meet. *Peters v. Wooten*, 297 S.W.3d 55, 65 (Ky. App. 2009). . . .
>
> . . . .
>
> In reviewing evidence supporting a judgment entered upon a jury verdict, the role of an appellate court is limited to determining whether the trial court erred in failing to grant the motion for a directed verdict or JNOV. *See Bierman v. Klapheke*, 967 S.W.2d 16 (Ky. 1998); *NCAA v. Hornung*, 754 S.W.2d 855 (Ky. 1988). All evidence which favors the prevailing party must be

-6-

taken as true and the reviewing court is not at liberty to determine credibility or the weight which should be given to the evidence, these being functions reserved to the trier of fact. We may not disturb the trial court's ruling unless the decision is clearly erroneous. *Peters v. Wooten*, 297 S.W.3d 55, 65 (Ky. App. 2009) (citing *Bierman*, 967 S.W.2d at 18). As such, a denial of a directed verdict or JNOV "should only be reversed on appeal when it is shown that the verdict was palpably or flagrantly against the evidence such that it indicates the jury reached the verdict as a result of passion or prejudice." *Id.* (citation omitted).

It is axiomatic that a trial court has the superior advantage in assessing the evidence for admissibility, thus resulting in our necessary deference to its evidentiary rulings. "A reviewing court is rarely in as good a position as the trial judge who presided over the initial trial to decide whether a jury can properly consider the evidence presented." *Bierman*, 967 S.W.2d at 18.

Gravity first argues that the trial court committed legal error in concluding that Berling had a "disability" under the KCRA, KRS Chapter 344.

Under KRS 344.040(1), it is unlawful for an employer to discharge or otherwise discriminate against an individual with respect to compensation, terms, conditions or privileges of employment because the person is a "qualified individual with a disability." The plaintiff bears the initial burden of establishing a prima facie case of disability discrimination against the defendant. In order to establish a prima facie case of discrimination based on a disability, the plaintiff must show: (1) that he had a disability as that term is used under the statute (i.e., the Kentucky Civil Rights Act in this case); (2) that he was "otherwise qualified" to perform the requirements of the job, with or without

-7-

reasonable accommodation; and (3) that he suffered an adverse employment decision because of the disability.

> Under KRS 344.010(4), a "disability" is defined as:
>
> (a) A physical or mental impairment that substantially limits one (1) or more of the major life activities of the individual;
>
> (b) A record of such an impairment; or
>
> (c) Being regarded as having such an impairment.

*Hallahan v. The Courier-Journal*, 138 S.W.3d 699, 706-07 (Ky. App. 2004)

(citations and footnotes omitted).

> The KCRA is interpreted consistently with the ADA [Americans with Disabilities Act]. But . . . the KCRA follows the pre-2008 ADA standards.
>
> . . .
>
> The pre-2008 ADA did not define "major life activities." . . . In interpreting the KCRA's § 344.010(4)(a) definition of a person with a disability using the pre-2008 ADA standards, the Supreme Court of Kentucky identified major life activities as including "walking, seeing, hearing, performing manual tasks, caring for oneself, speaking, breathing, learning, and working."

*Baum v. Metro Restoration Services, Inc.*, 240 F. Supp. 3d 684, 693-95 (W.D. Ky. 2017) (quoting *Howard Baer, Inc. v. Schave*, 127 S.W.3d 589, 592 (Ky. 2003)).

Specifically, Gravity argues that Berling's anxiety disorder failed to substantially limit a major life activity because it did not prevent him from

-8-

working, going about his day-to-day activities, or performing a wide range of other jobs. Thus, it contends that his claim is "easily dismissed." *Hallahan*, 138 S.W.3d at 709 ("A plaintiff must also show that his impairment significantly restricts his ability to perform either a class of jobs or a broad range of jobs, and not just his current or a single job."). Gravity acknowledges that the trial court's order denying its motion for JNOV "did not invoke this theory[.]"

Gravity submits that Berling's "claim is foreclosed unless he carried his burden to show that he was 'regarded as' having an impairment that substantially limited his ability to work." Further, that in order for him to succeed on such a theory, Gravity claims that Berling must show that an employer thought he was disabled and that his disability would prevent him from performing a broad class of jobs. Gravity argues that Berling failed to meet that burden because there was no evidence from which a jury could make such inferences undermining Brazil's beliefs.

The trial court ably addressed this issue in meticulous detail in its July 17, 2022, order denying Gravity's motion for JNOV:

> It is necessary only that plaintiff was "regarded as having such impairment." KRS 344.010(4)(c). "The purpose of protecting those who are regarded as disabled from discrimination is to prohibit employers from relying on 'stereotypic assumptions not truly indicative of individual ability.'" *Quiles-Quiels v. Henderson*, 439 F.3d 1, 6 (1st Cir. 2006). To establish that one is "regarded as" disabled, the plaintiff is required to

demonstrate:  (a) the employer mistakenly believed plaintiff had an impairment that substantially limits one or  more major life activity; or (b) the employer mistakenly believed that an actual, non-limiting impairment substantially limits one or more major life activity. *Howard Baer, Inc. v. Schave*, 127 S.W.3d 539, 594 (Ky. 2003). In "regarded as" cases, what an employer "regards" as disabled goes to the defendant's state of mind and is thus more appropriately a question of fact. *Ross v. Campbell Soup Co.*, 237 F.3d 701, 706 (6th Cir. 2001).

Plaintiff worked for the defendant for several months before his mental health issues came to their attention.  In that time he consistently received positive performance evaluations, he received a raise, and he was being trained to perform additional work in another department to which he desired to be transferred.  During those initial ten months of employment, it is likely that defendant did not regard plaintiff as disabled.  It is not necessary that an employer have advance notice of a disability, only that they regard him as having a disability at the time of the adverse action.  After plaintiff suffered his second panic attack in as many days, he was clearly regarded by the company as disabled.  After his panic attack on August 8, 2019, he was immediately escorted out of the building and his access to the building was cut off.  Three days later he was informed that he was terminated.  While defendant argues that their actions showed only that he was not qualified to work at his current position, their action in escorting him from the building and terminating him, rather than offering him another position, clearly shows to the contrary. Management's response to plaintiff's disability-related conduct revealed that they no longer believed that he could safely perform any class of work and was thus substantially limited in the major life activity of working.

Employers may legitimately fire employees for misconduct, even conduct that occurs as a result of a

-10-

disability, if that conduct disqualifies the employee from his or her job. *Yarberry v. Gregg Appliances, Inc.*, 625 F. App'x 729, 739 (6th Cir. 2015). Employers, however, are expected to "tolerate eccentric or unusual behavior caused by an employee's mental disability, so long as the employee can perform the essential functions of the job." *Id.* at 740. When considering whether an employee's conduct disqualifies him or her from her job, the [Equal Employment Opportunity Commission] 2008 Guidance and the Sixth Circuit suggests that certain factors should be considered, including: the manifestation or symptom of a disability affecting an employee's conduct, the frequency of occurrences, the nature of the job, the specific conduct at issue, and the working environment. *Id.* at 740.

The evidence at trial showed that the plaintiff excelled at his job for a period of ten months without incident and that he was well-liked by his co-workers. He suffered two panic attacks at work on successive days due to unusual situations which fell outside the scope of his day-to-day job responsibilities, and which were preventable by defendant had they only acceded to his reasonable request not to have a celebration of his birthday. Under these circumstances, plaintiff's disability-related conduct did not render him disabled to perform the essential functions of his job.

Defendant asserts that plaintiff was terminated due to safety concerns, arguing their employees have the right to feel safe at work. Employers are not required to tolerate disability-related conduct that is violent or threatening. *Yarberry* at 740, citing *Den Hartog v. Wasatch Academy*, 129 F.3d 1076 (10th Cir. 1997). As plaintiff's counsel pointed out in closing arguments, plaintiff too had the right to feel safe at work and that right was denied to him by the company ignoring his simple request. The evidence does not support a finding that any actions of plaintiff could have led to a reasonable apprehension for the safety of any employees.

-11-

Plaintiff's appearance at the time of his second attack may have been concerning, but there was sufficient evidence to support the finding by the jury that it was not objectively violent or threatening. "[P]roof that the employer's proffered reason is unpersuasive, or even obviously contrived, does not necessarily establish that the plaintiff's proffered reason is correct. In other words, it is not enough to disbelieve the employer; the factfinder must believe the plaintiff's explanation of intentional discrimination." *Williams v. Wal-Mart Stores, Inc.*, 184 S.W.3d 492, 498-99 (Ky. 2005); *see also Bishop v. Manpower, Inc.*, 211 S.W.3d 71, 75-77 (Ky. App. 2006). Here the evidence supported plaintiff's explanation of intentional discrimination as the termination was the immediate result of their discovery of his disability and the jury clearly found that explanation persuasive.

Viewing the evidence in the light most favorable to plaintiff and giving him the advantage of every fair and reasonable inference which can be drawn from the evidence; and not finding a complete absence of proof on a material issue upon which reasonable men could differ, the court concludes that the standard for granting a judgment notwithstanding the verdict has not been met.

We cannot improve upon the thorough analysis and sound reasoning of the trial court. After reviewing the evidence presented at trial, we are not persuaded that the jury verdict was palpably or flagrantly against the evidence so as to indicate that the jury reached the verdict as a result of passion or prejudice. Thus, we conclude that the trial court did not err in denying Gravity's motion for JNOV.

Next, Gravity argues that the trial court erred in denying its motion for a new trial without conducting an evidentiary hearing to investigate the

consequences of alleged juror misconduct; *i.e.*, that after the conclusion of the trial, it discovered that a juror had violated the trial court's instructions not to conduct any independent research or access media relating to the parties or facts of the case. Specifically, Gravity charged that after the trial concluded, Brazil discovered that a juror had viewed her LinkedIn page mid-way through trial.

By order entered on June 17, 2022, the trial court denied Gravity's motion for a new trial. It acknowledged that there was evidence that one juror had reviewed a professional profile page of defendant's Chief Operating Officer, who was a witness at trial. Gravity argued that this conduct gave the juror information regarding the parties' relative wealth. The trial court noted that testimony had been presented at trial regarding Gravity's recent success in operating COVID-19 testing sites and the resulting increase in profits and salaries. The court did not find that any information on the website would have had influence on the juror so as to warrant a mistrial or a new trial.

Additionally, there was no evidence that the juror had shared whatever he may have viewed with other jurors. The court emphasized that the jury verdicts were unanimous both in the finding of fault and in damages, reciting that "so even were the court to find that one juror was tainted, the verdicts were rendered by three more jurors than necessary and therefore the court concludes there was no prejudice to defendants caused by the action of the juror."

CR[1] 59.01 provides that: "A new trial **may** be granted to all or any of the parties and on all or part of the issues for any of the following causes: . . . (b) Misconduct of the jury. . . ." (Emphasis added.) This Court's "only function in reviewing the denial of a motion for new trial is to decide whether the trial judge abused his discretion." *McVey v. Berman*, 836 S.W.2d 445, 448 (Ky. App. 1992). We conclude it did not.

Nor do we agree with Gravity that it was an abuse of discretion not to conduct a post-trial hearing. As Berling notes, the cases upon which Gravity relies to support this argument are distinguishable on their facts. As another panel of this Court explained in *Lay v. Adley*, No. 2003-CA-001685-MR, 2004 WL 2201192, at *4 (Ky. App. Oct. 1, 2004),[2] "[t]he mere fact that post-verdict allegations of juror misconduct are raised does not automatically create a right to a hearing. We are of the opinion that the decision to conduct a hearing with respect to allegations of juror misconduct lies within the sound discretion of the trial court."

We affirm the sound analysis and judgment of the Kenton Circuit Court.

---

[1] Kentucky Rules of Civil Procedure.

[2] An unpublished opinion may be considered as permitted by Kentucky Rules of Appellate Procedure (RAP) 41.

ALL CONCUR.

BRIEFS FOR APPELLANT:

Katherine L. Kennedy
Bradley S. Fyffe
Lexington, Kentucky

John R. Maley
Kian J. Hudson
Indianapolis, IN

BRIEF FOR APPELLEE:

Anthony J. Bucher
Covington, Kentucky